## In the Matter of the DISCIPLINARY PROCEEDINGS OF Fred W. PHELPS, Sr., Respondent-Appellant.

### No. 81–1022.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 27, 1981.

Decided Feb. 27, 1981.

Rehearing Denied April 8, 1981.

---

Robert D. Ochs, Fisher, Ochs & Heck, Topeka, Kan., and Fred W. Phelps, Jr., Phelps-Chartered, Topeka, Kan., for respondent-appellant.

Before SETH, Chief Judge, and BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The cause before us calls for review of proceedings which took place in the United States District Court for the District of Kansas, wherein a three-judge court considered disciplinary charges which had been brought against the attorney in question, Fred W. Phelps, Sr., a member of the Kansas Bar. The proceedings in the federal

district court were follow-ups on similar proceedings which had been taken in the courts of Kansas. The Kansas Supreme Court ordered that Phelps be disbarred.

Phelps, in the Kansas court and here, is charged with making false statements to the court in tendering testimony, in his motion for new trial which referred to the nature of the testimony which would be presented by certain witnesses in the case of *Robinson v. Brady* in which he was appearing as an attorney, which case was heard and tried in the District Court of Shawnee County, Kansas. The specific statutory charge against Phelps was violation of K.S.A. 60–211 when he affixed his signature to the Motion for a New Trial in the *Robinson v. Brady* case. The particular disciplinary rules which he was charged with violating were:

DR 1–102 A 4 (engaging in conduct involving dishonesty, fraud, or misrepresentation);

DR 1–102 A 5 (engaging in conduct that is prejudicial to the administration of justice); and

DR 7–102 A 5 (knowingly making false statements of fact or law).

The state disciplinary panel found that Phelps had violated the above statute and ethical provisions, and recommended that he be censured. The Kansas Supreme Court found the findings of the panel to be supported by the record and found additional violations of DR 7–102 A 1 for illegal harassment of and carrying on a vendetta against Ms. Brady, one of the litigants in the case in question, and Phelps' oath as an attorney. The result of all of these determinations was an order that Phelps be disbarred. Petition for certiorari to the United States Supreme Court was filed, presented and denied. 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980).

Following the Kansas proceedings, the United States District Court for the District of Kansas issued an order directed to Mr. Phelps to show cause why similar sanctions should not be imposed against him in the federal district court. Thereafter a hearing was conducted by a panel of three judges, during which Phelps was allowed to present briefs and testimony of witnesses, including himself. The district court refused to impose the same discipline as that imposed by the Kansas Supreme Court; it acted on the ground that the state court decision was unconstitutionally based in part on the DR–7–102 A 1 charge, which was not listed in the Disciplinary Administrator's complaint nor considered by the state hearing panel. The district court held that since Phelps had no notice of that charge, and no opportunity to respond thereto, that he had been denied due process of law, and under local Rule 4A 11D the district court should not impose the same sanctions imposed by the state court.[1] As a consequence, the district court considered only the charges cited in the original complaint against Phelps, and found that Phelps had violated DR 1–102 A 4, DR 1–102 A 5, DR 7–102 A 5, and KSA 60–211. Phelps was suspended from practice in the United States District Court for the District of Kansas for a period of two years and he now appeals from that order.

The contentions raised by Mr. Phelps are as follows:

I. That the decision of the district court violates the Supreme Court's decision *In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117

---

1. Under the Local Rule 4A 11D, the district court will impose identical sanctions as those imposed by the state court unless the record shows that:

 1. the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
 2. there was such an infirmity of proof establishing the misconduct as to give rise to the clear conviction that this court could not, consistent with its duty, accept as final the conclusion on that subject; or

 3. the imposition of the same discipline by this court would result in grave injustice; or

 4. the misconduct established is deemed by this court to warrant substantially different discipline. Where the court determines that any of said elements exist, it shall enter such other order as it deems appropriate.

(1968), since the Kansas Supreme Court denied appellant due process of law when it found him guilty of violating DR 7–102 A 1, because Phelps had not been given notice of that charge and had been denied an opportunity to respond thereto.

II. That he was denied due process of law because the disciplinary action in the district court did not "embody a proper application of governing legal precepts".

III. That the district court incorrectly relied on the determination of the Kansas court that it must find that there was a "reasonable basis" for an attorney's belief that a witness would testify in a manner the attorney stated he expected the witness to testify to. Appellant argues that a proffer is merely an expression of expectations on the part of the lawyer and that a subjective test rather than an objective one should be applied when judging whether an attorney has made a truthful proffer.

IV. That appellant was denied due process of law because the district court failed to allow him to present a closing argument to the hearing panel.

V. That the standard of review employed by the district court was invalid, and that significant consequences followed therefrom.

VI. That there was no clear and convincing evidence in the record which established that Phelps had no reasonable basis to expect that these witnesses would testify in a manner that Phelps stated that they would testify.

I.

■ The district court correctly held that the defendant had been deprived of his rights under the due process clause in accordance with *In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), when the state court found him guilty of violating DR 7–102 A 1, the charge in which he

had not been given notice. Therefore, the district court did not follow the judgment of the state court on that issue. It rendered instead its judgment solely on the misrepresentation issue. Phelps maintains that under *Ruffalo*, if the state judgment was based partly on a charge that appellant had neither notice of nor an opportunity to respond to, the court should not impose *any* discipline on appellant. This we disagree with.

In *Ruffalo* the Supreme Court did not state that if the findings of the state court are based in any part on a charge denying an attorney due process of law, that all charges would thereby become a nullity. *Ruffalo* merely stands for the proposition that courts may not impose discipline on an attorney based upon specifications with respect to which the attorney had not received notice. In *Ruffalo*, the Supreme Court specifically stated that the court of appeals had only considered the charge which the Supreme Court found to not have afforded the attorney due process of law, since the attorney had not been given notice of that charge (charge no. 13). 390 U.S. at 547, 88 S.Ct. at 1224. While the state court had disbarred the attorney on two grounds (one of which the attorney did have notice of), the court of appeals did not address the charge which the attorney had been given notice of. In this case, however, the district court suspended Phelps because of conduct of which he had been originally charged in the complaint. We hold that the district court's reading of *Ruffalo* was correct, in that it does not require that the entire proceeding be held void simply because there was a failure to give notice on one charge. The district court was not precluded from disciplining Phelps under the charges which were specified and with respect to which he was given notice under the doctrine of *In Re Ruffalo*.

II.

■ Phelps alleges that he was denied due process of law because the disciplinary action of the district court did not "embody a proper application of governing legal pre-

cepts." See *Matter of Abrams*, 521 F.2d 1094 (3rd Cir. 1975). Appellant relies on *Abrams* for the proposition that since the court's decision must "embody a proper application of governing legal precepts," he should not be disciplined for conduct which was not previously judicially announced. In so contending, however, appellant has misread that case. The Third Circuit found in *Abrams* that the district court had not applied governing legal precepts because when imposing more serious discipline upon the attorney (disbarment) than that imposed by the state court (suspension for one year), the district court relied upon an earlier state case which was explicitly distinguished by the state supreme court when the state considered the case against Abrams. The Third Circuit held that the governing legal precept which the district court should have applied was the state court's decision regarding Abrams, and not an earlier case which was discredited.

It is quite true that appropriate action by the federal court must be in accordance with application of governing legal precepts. The question is, what are governing legal precepts? The fact that no prior cases have considered this particular ethical charge involving misrepresentation contained in a motion for new trial does not mean that such conduct cannot constitute an ethical violation. In other words, the facts rule the issue.

The disciplinary rules which Phelps is charged with violating give sufficient notice of the type of conduct which is grounds for disciplinary action. Under DR 1-102 A 4, a lawyer is prohibited from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. Recognition of fraud or deceit does not require use of examples. Disciplinary Rule 1-102 A 5 provides that a lawyer may not engage in conduct which is prejudicial to the administration of justice. Disciplinary Rule 7-102-A 5 prohibits a lawyer from knowingly making a false statement of law or fact. It is not necessary that the Rules list each and every instance in which a lawyer may possibly violate these Rules, and it is unnecessary that there must have been previous judicial construction of the Rules in order for governing legal precepts to exist.

### III.

Appellant maintains that the district court incorrectly relied on the determination of the Kansas Supreme Court that it must find that there was a "reasonable basis" for an attorney's belief that a witness would testify in the manner the attorney stated he expected the witness to testify. Appellant's view is that since by definition a proffer is merely an expression of expectation, a proffer of testimony in a motion for new trial should be judged by subjective inquiry rather than objective inquiry in deciding whether an attorney made a truthful proffer. That is, since the test is "what does the attorney expect the witness to testify to?", the attorney's expectations must be judged subjectively.

Defining the term "proffer" is only the beginning of our inquiry, however. We must further inquire as to what is an expectation. As the Kansas Supreme Court said, written references to expected testimony of witnesses in a motion for a new trial constitute a representation to the court that a new trial should be granted because of the quality of proof available. If such a motion is prepared in an attorney's office, it ought to be carefully and studiously drafted, inasmuch as the attorney is representing to the court, in accordance with K.S.A. 60–211, the *facts* that the witness will testify to. (Opinion of the Kansas Supreme Court, p. 19). It is plain, then, that a written proffer expressing an expectation of testimony has to be based not on mere conjecture or wishful thinking, but on actual knowledge and thoughtful reasoning. Thus the attorney must have concluded that there were logical and factual reasons for arriving at his expectation. To hold that the only rational test in a disciplinary context is whether the attorney had any basis at *all* upon which to arrive at an expectation is not acceptable. If this were true any attorney could, consistent with the Rules of Ethics, sign his name to a totally irrational or unrealistic complaint, proffer, affidavit or pleading.

There are other facets which apply to this question.

First, the district court held that appellant had knowingly misrepresented facts in his proffers. Therefore, even if a general subjective test were applied, under such a test the district court would still have found the appellant guilty of misconduct.

Second, a pure subjective test would allow any attorney, at any time, to say, "well, I believed that," and no court could ever impeach him. This is surely an undesirable way to approach the matter because a court would be compelled to accept whatever an attorney said and grant a new trial on that basis. A standard of this kind would be unrealistic and would be out of harmony with the entire purpose of the Code of Ethics.

## IV.

### WHETHER THE DISTRICT COURT ERRED IN DENYING APPELLANT AN OPPORTUNITY TO PRESENT A CLOSING ARGUMENT.

 The answer is no. First, there is a due process right to present closing arguments in criminal cases. *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). The present proceedings, although quasi criminal, are not criminal. *In re Ruffalo*, supra, 390 U.S. at 551, 88 S.Ct. at 1226. The rules in a disciplinary proceeding are less exacting. *Randall v. Brigham*, 74 U.S. (7 Wall.) 523 (1869). The standard in the present proceedings is one of permitting the attorney a fair opportunity to present his case. In this case Phelps received a fair opportunity to present testimony, briefs and suggested findings. No formal closing arguments were required.

## V.

### WHETHER THE STANDARD OF REVIEW WHICH WAS FOLLOWED BY THE COURT WAS CORRECT AND IF NOT, WHETHER IT WAS PREJUDICIAL.

 The district court recognized that the proceeding in that court was not an appellate review of previous disbarment procedures in the Kansas Supreme Court. It recognized that it must virtually sit de novo in review of the state court proceedings, except for lack of opportunity to judge the credibility of panel witnesses and the fact that it was compelled under due process to hear live evidence from the respondent as well. Nevertheless the court stated that the standard to be applied when reviewing the factual basis of the state action was the standard applied when conducting an appellate review of criminal cases. It said:

> This court must view the evidence *in the light more favorable to the state* to decide if there is sufficient substantial, clear and convincing proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which the panel and the Kansas Supreme Court might find the respondent guilty of the alleged ethical improprieties.

(Opinion, p. 12, emphasis added).

We have recently held that it is the responsibility of the district court to virtually sit de novo in review of the state court proceedings except for hearing and considering anew live testimony, and to *independently* test the district court rule against the state findings of fact. *In Re Gordon* (Nos. 80–1613, 80–8010, 10th Cir. 1980). This is in accord with the Supreme Court's decision in *Selling v. Radford*, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). The Supreme Court held in *Selling* that in deciding whether to recognize and apply the disciplinary decision of the state court, the federal court should engage in an intrinsic consideration of the state record and determine whether the attorney was denied due process in the state procedure, whether the record lacks clear and convincing factual proof of misconduct, or whether there exists some other grave reason which would render application of the state court penalty an injustice. Kansas Rule 4A, IID embodies the factors set forth in *Selling* which call for an independent review.

Accordingly, then, the statement by the district court that it should apply a stan-

dard of appellate review in a disciplinary hearing is not correct. Thus the evidence should not be considered in a light most favorable to the state. The district court is obliged to review the evidence independently and determine whether there is clear and convincing proof that Phelps was guilty of misconduct. This leaves us with only one alternative, which is to ascertain whether or not it appears that the error was serious or was not prejudicial. After evaluating the evidence, we conclude the latter.

## VI.

The finding in the district court was that Phelps had misrepresented his proffered testimony of the following proposed witnesses: Dan Turner, Richard Brewster, Rodney Joyce, Kathleen Fitzgerald and B. L. Pringle. The question is whether there is clear and convincing evidence in the record showing that Phelps had no reasonable basis to expect that these witnesses would testify in the manner that Phelps stated they would testify. Turning now to the testimony which was proffered in the motion for new trial, Phelps stated the following in regard to his proffer of how these five witnesses would testify:

That each such person had relevant knowledge of the defendant Brady, knew her reputation in the community for truth and veracity, and that such reputation was bad; further, that from their knowledge in the community they had an opinion as to the truthfulness and veracity of defendant, and as to the attitude of defendant toward her oath or other solemn obligation to speak the truth and be bound by any such oath or solemn judicial obligation, and that in their opinion defendant was not a truthful person and had scant regard toward her oath or any such solemn obligation, and further, that they had knowledge of specific instances of conduct by defendant including but not limited to the conduct of defendant when employed as the court reporter for two separate grand jury investigations in Shawnee County, and wherein the defendant Brady had a sworn duty not to reveal such grand jury proceedings to

outsiders, and to maintain all such proceedings in strict secrecy, and notwithstanding such bounden and solemn duty under the law, the defendant Brady repeatedly "leaked" knowledge of such proceedings to certain of those being investigated by such grand jury including but not limited to: Morris "Pete" Peterson; Gary Guerrero; Peggy Guerrero; the brother of Governor Robert Docking; and others connected to the so-called "artichitectural kickback case", and further included but not limited to the conduct of defendant in "leaking" two confidential transcripts taken by Dan Turner in his investigation of a matter involving Bill Glenn, such statements being sworn statements of Kathy Fitzgerald and Karen Kennedy, which statements were taken in secrecy and for which the defendant was bound to secrecy and which were delivered by Mrs. Brady to the news media and consequently published in violation of her solemn oath and duty. Rejecting Appendix "C" in connection with such proffer.

The question is whether Phelps had a reasonable basis for believing that these people would testify that they knew Brady's reputation in the community for truth and veracity was bad, that they personally believed Brady to be untruthful, and that they had knowledge of specific instances of conduct by Brady whereby Brady had violated her oath as a court reporter by leaking information contained in secret proceedings to outsiders.

Now, we must look to the testimony.

### A. *Dan Turner* :

Ralph Hiett, a private investigator, testified that he told Phelps that based on conversations that Hiett had with other people, and not Dan Turner himself, that Turner would testify that Brady was not truthful and that Brady's reputation for truthfulness was bad. Hiett testified that he had not told Phelps one way or the other whether Hiett had personally talked to Turner.

William Glenn, an attorney, testified that information obtained in a confidential deposition involving Glenn as a defendant was

"leaked" to the news media. Glenn testified that the only person present at that confidential proceeding other than Glenn himself were Dan Turner, Kathy Fitzgerald and Karen Kennedy (who were testifying against Glenn), and Brady (who was the court reporter). Glenn stated that he had been told by the person who published the information in the media that the information had not been given to the media by Mr. Turner, and that Glenn had relayed that information to Hiett and Phelps. Further, Glenn stated that he told Phelps that Fitzgerald and Kennedy had not leaked the information to the media; that Turner was very upset about the leak, and that Turner had made a statement that he felt Brady was the one who leaked the information to the media.

From this testimony Phelps could have reasonably believed that Turner would testify that in his opinion Brady was untruthful. In addition, it is possible that Phelps could have reasonably believed that Turner would testify that Brady's reputation for truthfulness was bad. That's as far as it goes, however. There is no evidence that Phelps had any basis at all for believing that Turner had knowledge that Brady had leaked information to outsiders. All that was to be gleaned from Glenn's statements is the possibility that Turner believed that Brady leaked the information; not that Turner knew Brady leaked the information. Phelps, therefore, was relying on innuendos. Even giving Phelps the benefit of every doubt we have to agree that the record contains clear and convincing evidence that Phelps had lacked a reasonable basis to expect that Turner would testify as Phelps said Turner would testify.

B. *Kathleen Fitzgerald*:

Phelps testified that Ms. Fitzgerald had told him that she did not want the information regarding the Glenn matter published, that she was upset that the information had been leaked, and that she had heard that Brady could not be relied on. Mr. Hiett testified that he had been told by Ms. Fitzgerald that she believed that Brady had leaked the story, since in her opinion Mr. Turner would not have done so.

The basis for Phelps proffer as to Ms. Fitzgerald's testimony is substantially the same as his proffer regarding Dan Turner's testimony. Phelps was intending to show that Ms. Fitzgerald did not want the information regarding the Glenn matter publicized; that neither Turner, Kennedy or Fitzgerald had leaked the information to the press; and therefore, that it logically followed that Brady had leaked that information. This reasoning does not imply actual knowledge. Again, while it may have been possible for Phelps to have reasonably believed that Ms. Fitzgerald would testify that in her opinion Brady was untruthful and that Brady's reputation for truthfulness was bad, there is no evidence to show that Ms. Fitzgerald had any knowledge at all that Brady had leaked the information. Accordingly, the record contains clear and convincing evidence that Phelps had no reasonable grounds to expect that Ms. Fitzgerald would testify in the manner that Phelps said she would testify.

C. *Richard Brewster and Rodney Joyce (Reporters)*:

Mr. Hiett testified that he had inquired of Mr. Brewster over the telephone as to how Brewster obtained the information that Channel 27 News published in regard to the Bill Glenn matter. According to Hiett, Brewster told him that he had not received the information from Dan Turner; that the source of his information was confidential. Hiett also stated that Brewster said that he knew that Brady was a notorious liar. Hiett relayed all this information to Phelps.

Phelps testified that although he had spoken to Brewster on the telephone, Brewster had not said whether he would or would not testify as Phelps said Brewster said he would testify.

Hiett testified that he told Phelps that Rodney Joyce would testify that Brady was untruthful. Hiett also told Phelps that Joyce knew Brady had a reputation for violating her oath. Hiett further testified, however, that Joyce indicated during a telephone conversation that he would maintain the confidentiality rule, and that he would not discuss Brady's reputation.

Phelps testified that he believed that if Joyce were on the witness stand, since Joyce had since gone to law school, that the "lawyer" would prevail over the "reporter", and Joyce would testify regarding Brady's reputation. Phelps stated that at one time Joyce indicated to Phelps by telephone that he had some knowledge of Brady's reputation from his work in the Glenn investigation.

The evidence shows that while Phelps could have reasonably hoped or expected Brewster to testify that he believed Brady to be untruthful, and that Brady's reputation for truthfulness was bad, there is no evidence to show that Brewster had knowledge that Brady had leaked information to outsiders on any specific occasion. Further, the evidence clearly shows that not only was there no reasonable basis to believe that Joyce had knowledge that Brady had ever leaked information to outsiders, there was no reasonable basis to believe that Joyce would testify as to Brady's reputation for truthfulness. Thus, there is clear and convincing evidence that Phelps lacked reasonable grounds to expect that Brewster and Joyce would, in fact, testify in the manner that Phelps said they would testify.

### D. *B. L. Pringle*:

According to Phelps, he planned to call Mr. Pringle, an attorney, as a witness to give testimony about a prior similar incident involving Brady's failure to provide a criminal transcript. To that end Mr. Hiett testified that Pringle told Hiett that Brady did not provide him with a transcript when such was required, and that as a result, Pringle did not trust Brady and stated he would never use her again as a court reporter. Hiett gave this information to Phelps, and Phelps also talked to Pringle regarding this matter. This expected testimony, however, is not even mentioned in Phelps' proffer, and, therefore, is irrelevant to this case.

Mr. Hiett testified that he told Phelps that Pringle told Hiett that Brady was not trustworthy, and that she had relationships with other lawyers for the purpose of getting court reporting business. Further,

Hiett testified that he told Phelps that Pringle was knowledgeable about the grand jury proceedings about which Phelps alleged Brady had leaked information. Hiett stated that Pringle indicated that he had agreed with Hiett's belief that Brady was leaking information. On cross-examination Hiett testified that he had never asked Mr. Pringle if he would testify to those matters; that he was only referring to how Pringle "felt".

Phelps testified that he had never discussed with Pringle the issue of whether Pringle would testify regarding the grand jury matter or about Brady's reputation.

While there may have been reasonable grounds for Phelps to have expected that Pringle would testify to his belief as to Brady's truthfulness, or to Brady's reputation for truthfulness, there is no evidence to show that Pringle had any knowledge that Brady had leaked information at any time. According to the evidence, Hiett told Pringle that he, Hiett, believed that Brady was leaking information, and Pringle indicated that he agreed. This evidence provides no basis for an expectation that Pringle had any knowledge whatsoever of such matters. The evidence is clear and convincing that Phelps had no reasonable grounds to expect that Pringle would testify in the manner that Phelps said he would testify.

### CONCLUSIONS

We are of the opinion that the evidence does not indicate that these people would all testify that they knew Brady's reputation in the community for truth and veracity was bad, and that they all personally believed Brady to be untruthful. Further, the evidence does not show that *any* of these people had knowledge of specific instances of conduct by Brady whereby Brady had violated her oath as a court reporter by leaking information obtained in secret proceedings to outsiders.

There is evidence that these witnesses had said in conversations with the private investigator that Brady was not truthful and that Brady's reputation for truthfulness was bad; however, there is no assur-

ance from the fact that they would make statements to a private investigator that they could be expected to testify regarding their statements on the witness stand. What the private investigator reports is not a basis for any lawyer to stake his professional reputation on by representing that there would be specific testimony on a subject. Much of the testimony was circumstantial and called for a process of deduction. In other words, there were no hard facts on which to base an expectation; far from it, indeed.

In the case of Fitzgerald, according to Phelps, Fitzgerald had said to Phelps that she did not want the information regarding the Glenn matter publicized, that she was upset that the information had been leaked, and that she had never heard that Brady could not be relied on. Hiett testified that he had been told by Ms. Fitzgerald that she believed Brady had leaked the story, since, in her opinion, Turner would not have done so. But any information that Fitzgerald might have regarding Brady leaking information to the press was pure deduction on the part of Mr. Phelps. In the case of Brewster, Phelps testified that although he had spoken to Brewster, Brewster had not said whether he would or would not testify as Phelps said he would testify. In the case of Joyce, while Hiett told Phelps that Joyce would testify that Brady was untruthful, and that Joyce knew Brady had a reputation for violating her oath, Joyce indicated during a telephone conversation that he had maintained the confidentiality rule, and that he would not discuss Brady's reputation. Mr. Phelps may well have had hopes as to the form that the testimony would take, but hopes are quite different from actual facts and realistic expectations, and there is no indication in Phelps' proffers regarding the testimony of his witnesses that they were based on hopes.

Our conclusion is that Mr. Phelps stated unjustified conclusions in the motion for a new trial. We do not condemn him for listening to the private investigator. But as to this he was not justified in treating the investigator's statements as the gospel

without interviewing the witnesses. It is fundamental that a trial lawyer interviews witnesses before relying on the character of the testimony which he expects they will give. Moreover, Mr. Phelps made the mistake of drawing and concluding far too much from limited knowledge as to actual testimony which was reasonably to be expected. This is the essence of his misrepresentations.

We take notice of the fact that it is very seldom that a witness, even though he knows a person tends to be untruthful, will take the witness stand and express his opinion as to the truthfulness of that person; that is, as to whether or not he or she is a truthful person. Finally, we note that there is virtually no direct evidence that Brady "repeatedly leaked knowledge of such grand jury proceedings to certain of those being investigated by such grand jury".

We must hold, then, from a review of the evidence, that even giving Mr. Phelps the benefit of every doubt, the evidence strongly supports the conclusion that Mr. Phelps had no reasonable grounds for expecting that any of these people were going to testify as to a matter as difficult to testify to as bad reputation for truth and veracity in the community. Further, there is no evidence that any of these people had knowledge that Brady had violated her oath as a court reporter. We must hold, therefore, that Phelps is guilty of ethical impropriety.

The judgment below is generally affirmed (as corrected).

Inasmuch as Misc. No. 80–8008 is consolidated with the above case, it is disposed of on the same basis.