**Carlos ROMERO–BARCELO,**
**Petitioner,**

v.

**Anibal ACEVEDO–VILA, Respondent.**

No. 00–091(JAF).

United States District Court,
D. Puerto Rico.

July 31, 2003.

Edward Borges, Esq., Jane Becker Whitaker, Esq., Borges Law Center, PSC, San Juan, for Petitioner's.

Harry Anduze Montaño, Esq., San Juan, Johanna Emmanuelli Huertas, Esq., Law Offices of Pedro Ortiz Alvarez, Ponce, for Respondent's.

## OPINION AND ORDER

FUSTE, District Judge.

On June 23, 2000, Carlos Romero–Barceló ("Petitioner Romero–Barceló"), filed a motion requesting disbarment of Aníbal Acevedo–Vilá ("Respondent Acevedo–Vilá"). After evidentiary and formal disciplinary hearings, a Panel ("Panel") appointed by this court rendered its Report and Recommendation ("Report") on April 16, 2003. *Docket Document No. 67.* The Panel recommended that Respondent be publicly reprimanded for violations of Rule 8.4 and 3.1 of the Model Rules of Professional Conduct. Respondent Acevedo–Vilá opposed the Report, raising objections to the proceedings and the Report's conclusions. *Docket Document 70.* After a careful review of the entire record, we recommend that the district judges of this court issue a public reprimand.

Duty compels us to adjudicate this legal dispute brought by two attorneys who happen to be political rivals. We note with disillusion and dismay the depths to which public discourse has fallen, and we hope, though indications are to the contrary, that this court is seldom, if ever, used to resolve matters that are best left to other arenas. That said, we will not shirk our responsibility to enforce the highest standards of ethical conduct for any individual who wishes to practice before this Federal District Court.

It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," . . . in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

*Schware v. Bd. of Bar Exam's,* 353 U.S. 232, 247, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring).

We have addressed the issues before us with Justice Frankfurter's words in mind, in order, not to play party politics, but to preserve the integrity of the Bar. We strongly urge the other judges of the court to adopt a similar stance, so that the message can be sent loud and clear. Unethical conduct will not be tolerated, no matter how it arises, or who is involved.

## I.

### Factual and Procedural Synopsis

To review the origins of this matter, we largely reiterate the Panel's factual synopsis, expounding where appropriate. *See Docket Document 63.*

In June 2000, Petitioner Romero–Barceló filed a petition for disbarment. At the time, Respondent Acevedo–Vilá was the minority leader of the Popular Democratic Party's ("PDP") delegation in the Puerto Rico House of Representatives. He was also a candidate in the November 2000 elections for the federal position of Resident Commissioner of the Commonwealth of Puerto Rico in the United States House of Representatives, a position which he subsequently secured. Complainant Romero–Barceló opposed Respondent Acevedo–Vilá in these elections as the incumbent Resident Commissioner, representing the New Progressive Party ("NPP"). Both men were, and are, attorneys-at-law in Puerto Rico and members

of the Bar of the United States District Court for the District of Puerto Rico.

Respondent Acevedo–Vilá has been an attorney since 1985 and was a member of the Puerto Rico House of Representatives from 1992 through 2000. Beginning in 1997, as Speaker for the Minority at the House of Representatives, Respondent Acevedo–Vilá became actively involved in monitoring governmental action related to the implementation of the Puerto Rico Health Reform Act, Law 190 ("Law 190"). ACT TO REGULATE THE GOVERNMENT HEALTH INSTALLATIONS PRIVATIZATION PROCESS, 1996 P.R. Laws 190. Law 190 granted the Puerto Rico Department of Health and the Government Development Bank ("GDB") the authority to design, establish, and carry out the procedures and provisions for the sale of Diagnostic and Treatment Centers ("DTC") to private entities.

While Respondent Acevedo–Vilá knew that the Health Department and the GDB were legally authorized and empowered to conduct and control the privatization process and sale of the DTCs, Respondent was concerned that several DTCs had been sold for a price either below the amount of public debt held by the DTC, or below their appraisal/market value. Respondent exchanged communications with the Puerto Rico Comptroller, Manuel Díaz Saldaña ("Comptroller Díaz Saldaña"), and other government representatives, and made public his disagreement with the process of privatization of the DTCs.

Sometime during the month of September 1999, Respondent Acevedo–Vilá received three sworn statements, dated August 27, 28, and 30, 1999 ("Sworn Statements"), by Andrés Sánchez–Delgado ("Sánchez–Delgado"). The statements were made as part of Sánchez–Delgado's efforts to file a civil action against his employer, Dr. Carlos Juan Rodríguez Mateo, a politician affiliated with the NPP and a prominent physician, alleging wrongful termination of employment and sexual harassment. Sánchez–Delgado narrated in detail a series of events, of which he claimed to have personal knowledge, involving Petitioner Romero–Barceló. Specifically, Sánchez–Delgado alleged that he delivered $175,000 to one of Romero–Barceló's personal aides, Mr. Domingo García ("Domingo García"). According to the August 27 and 28 statements, the delivery took place at a political activity being held in Guayama, Puerto Rico, in connection with a December 1998 plebiscite. Sánchez–Delgado averred that the $175,000 belonged to Dr. Rodríguez Mateo, and that the money was a "gift" for Romero–Barceló in exchange for his alleged assistance and/or intervention in favor of Dr. Rodríguez–Mateo's acquisition of a DTC in Salinas, Puerto Rico ("Salinas DTC"). Petitioner's alleged intervention was to be on behalf of a corporation called Med–Sur, of which Dr. Rodríguez Mateo is an officer, and to which the bid for the Salinas DTC was eventually awarded.

Respondent Acevedo–Vilá and his assistant, Attorney Carlos Ruiz ("Attorney Ruiz"), assert that Sánchez–Delgado's sworn statements were thoroughly examined and analyzed by Respondent Acevedo–Vilá and his assistants, and that Respondent's assistants compiled public documents related to the sale of the Salinas DTC and any political contributions made to Romero–Barceló by Dr. Rodríguez Mateo or persons related to him. Both Attorney Ruiz and Respondent Acevedo–Vilá were able to confirm certain facts alleged by Sánchez–Delgado in his Sworn Statements including, *inter alia*, that Petitioner Romero–Barceló had contacted the GDB during the bidding process, that the Salinas DTC was sold for less than the appraisal value, and that the father of Dr. Rodríguez Mateo was a member of Petitioner Romero–Barceló's security escort.

On or around September 27, 1999, Respondent Acevedo–Vilá held a news conference denouncing the sale of the Salinas DTC at 48% of its book value of $2,379,987 and 55.5% of the $2,073,134 debt that the Puerto Rico Health Department had with government bondholders. Respondent Acevedo–Vilá requested that the GDB investigate the statements made by Sánchez–Delgado regarding Petitioner's alleged intervention on behalf of Med–Sur in the acquisition of the Salinas DTC. Respondent Acevedo–Vilá also issued a press release, in which he suggested that the information provided by Sánchez–Delgado, along with that reflected in documents disclosed by the GDB "raised serious questions about the sale of the Salinas DTC." Respondent Acevedo–Vilá also noted that the DTC was sold during a year in which a plebiscite was held in Puerto Rico, and suggested the possibility of an NPP scheme to promote the sale of DTCs below market price in exchange for diverting funds to the NPP campaign.

Petitioner Romero–Barceló denied Sánchez–Delgado's statements, and countered that he did not remember talking to Dr. Rodríguez–Mateo about the Salinas DTC. His assistant, Domingo García, acknowledged that he had talked to Dr. Rodríguez–Mateo about the purchase of the Salinas DTC, and also admitted that he called the GDB inquiring on the status of the transaction.

During the same time period, members of the PDP, Respondent Acevedo–Vilá's political party, were denouncing prior attempts by Sánchez–Delgado to offer false testimony against PDP leaders and warning others about Sánchez–Delgado's lack of credibility. Respondent Acevedo–Vilá attempted to determine whether Sánchez–Delgado's testimony was credible by contacting Attorney David Noriega, a political analyst who interviewed Sánchez–Delgado at a radio talk show. Attorney Noriega's opinion was that Sánchez–Delgado appeared to be credible and knowledgeable of facts regarding personal and family activities of Dr. Rodríguez–Mateo. Respondent Acevedo–Vilá, however, could not confirm that this conversation about Sanchez–Delgado's credibility happened before he filed the complaint with the Federal Elections Commission ("FEC") that gave rise to this matter.

A flurry of press releases by Respondent Acevedo–Vilá followed. On September 30, 1999, Respondent distributed a press release, calling upon Petitioner Romero–Barceló to explain, *inter alia,* his "connections with Dr. Carlos Rodríguez Mateo, whom it is alleged made an illegal contribution of $175,000 to [Romero–Barceló's] re-election campaign ..." On October 6, 1999, Respondent Acevedo–Vilá issued another press release requesting that Comptroller Díaz Saldaña investigate the sale of DTCs sold below appraisal value, which he asserted could be indicative of a generalized scheme of illegal contributions. On the same date, the local newspaper EL NUEVO DIA reported that Comptroller Díaz Saldaña had agreed to examine Sánchez–Delgado's sworn statements to determine the legality of the DTC sale process.

■ On October 7, 1999, Respondent Acevedo–Vilá held a press conference announcing that he was filing a complaint with the Federal Election Commission ("FEC"),[1] alleging that Petitioner Romero–Barceló violated the Federal Election

---

1. The FEC is a quasi-judicial body or administrative agency of the federal government. *See* 2 U.S.C. §§ 437c–438 (1994); *FEC v. NRA Political Victory Fund,* 513 U.S. 88, 97, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994) (assuming that the FEC is an agency); *Becker v. FEC,* 230 F.3d 381, 384 (1st Cir.2000) (same). Attorneys-at-law are bound by the rules of professional conduct when they appear before the agency. *Cf.* MODEL RULES OF PROF'L CONDUCT R. 8.4 cmt (1983) (noting that a "lawyer

Campaign Act of 1971, as amended, 2 U.S.C. §§ 431–56 (1994). In a press release on the same day, Respondent Acevedo–Vilá avers that he was prompted to file the complaint with the FEC because of the state government's alleged continued refusal to investigate Sánchez–Delgado's statements regarding an illegal contribution to Romero–Barceló's political campaign.

The FEC complaint alleged that Petitioner Romero–Barceló received an illegal campaign contribution of $175,000 from Sánchez–Delgado. The complaint also maintained that Sánchez–Delgado, pursuant to orders given by his employer, gave the money directly to Domingo García, Director of former Resident Commissioner Romero–Barceló's District Office in Puerto Rico, for Petitioner Romero–Barceló's election campaign. The FEC complaint further asserted that Dr. Rodríguez–Mateo made the contribution in exchange for Petitioner's assistance in Dr. Rodríguez–Mateo's acquisition of a medical institution in Salinas, Puerto Rico, for a price below the Government of Puerto Rico's selling price.

On October 15, 1999, Comptroller Díaz Saldaña publicly stated that he was investigating the sale of the Salinas DTC and other hospitals, and that he intended to interview Dr. Rodríguez–Mateo and Sánchez–Delgado.

On October 19, 1999, the FEC acknowledged the receipt of the Request for Investigation against Romero–Barceló. The letter advised Respondent Acevedo–Vilá that any additional information regarding the matter should be forwarded to the Office of the General Counsel of the FEC.

By letter dated January 13, 2000, Respondent Acevedo–Vilá supplemented his

FEC complaint by submitting additional information that he alleged related to the facts presented in the original complaint. Attached to the letter were two January 5, 2000 newspaper articles, one published by EL NUEVO DIA, and the other presumably published by a local English language newspaper, THE SAN JUAN STAR. In the letter, Respondent Acevedo–Vilá alleges that these articles "depict an ongoing probe, by the U.S. District Attorney's Office [sic] for the District of Puerto Rico, the FBI and the U.S. Postal Service on possible conduct related to 'the events described in my complaint.'" Both articles, however, relate that Sánchez–Delgado was questioned about allegations that Med–Sur had allegedly defrauded Humana Insurance of $15 Million. The only details that bear any reference to the FEC complaint are in THE SAN JUAN STAR article, which gives background details on Sánchez–Delgado and also reports that Sánchez–Delgado had received death threats because of the civil suit he filed against Rodríguez–Mateo.

On March 29, 2000, a radio news station, NOTI–UNO, broadcasted a March 16, 2000 recorded statement made by Sánchez–Delgado, in which he recanted the sworn statements he had made in August of 1999. In the recording, Sánchez–Delgado stated that his original statements against Romero–Barceló were false, and were made because he was upset with Dr. Rodríguez–Mateo. He also alleged, *inter alia*, that he was paid to make the statements against Romero–Barceló by his attorney, former NPP senator Nicolás Nogueras, PDP Representative Guillermo Valero, and Respondent Acevedo–Vilá. Subsequently, on March 24, 2000, he recanted the March 16, 2000 statement, averring that he was threatened by NPP

must comply with applicable rules at all times, whether or not acting in professional

capacity").

sympathetic employees of the Municipality of Bayamón to state that Respondent Acevedo–Vilá had prompted him to lie in the original sworn statements that formed part of the FEC complaint.

On March 30, 2000, Respondent Acevedo–Vilá was interviewed at a NOTI–UNO radio show. During the interview, the NOTI–UNO reporter asked Respondent Acevedo–Vilá about Sánchez–Delgado's credibility in light of the March 16 and March 24 statements. Respondent Acevedo–Vilá expressed that Sánchez Delgado lacked credibility and that, in light of these contradictions, Sánchez–Delgado would not make a good witness.

On May 18, 2000, the newspaper EL VOCERO began publishing a two-week series of investigative reports in which it recounted a scheme which Respondent allegedly masterminded. The scheme purportedly involved payments of money to an attorney who would then ensure that libelous claims against Petitioner Romero–Barceló were made public.

On June 1, 2000, Petitioner Romero–Barceló asked Respondent Acevedo–Vilá, publicly and in writing, to withdraw his complaint with the FEC, inasmuch as the same was based on the statements by Sánchez Delgado.[2] Petitioner alluded to Sánchez–Delgado's accusations implicating Respondent Acevedo–Vilá in a scheme to defame him. Petitioner Romero–Barceló alerted Respondent Acevedo–Vilá that inaction would result in legal action.

2. We reproduce the text of the letter below:

Dear Mr. Acevedo,

On the seventh day of October 1999 you submitted a complaint against me, signed under oath, for an alleged violation of the federal election campaign laws. Your statement was based on a sworn statement made by Andrés Sánchez Delgado, which you endorsed and relied on, assuming and accepting as true all the libelous and defamatory charges made by him against my District Director Domingo García. In your complaint you stated, without any evidence whatsoever, that I had been given an amount of money for intervening in the alleged favoritism to Dr. Carlos Rodríguez Mateo.

At all times you knew that I had no governmental, administrative or executive authority over the persons making the decision to sell to Dr. Rodríguez Mateo. As a matter of fact on March 30th, 2000 you stated that Andrés Sánchez Delgado did not have any credibility whatsoever. I asked you publicly, as a result of your public statement regarding the lack of credibility of Andrés Sánchez Delgado, to withdraw your complaint, which was solely based on the perjured statement of Andrés Sánchez Delgado. So far you have failed to do so.

More recently, the local press has published information, supported by the sworn statements corroborated by a polygraph expert, that you have been involved in bribing Andrés Sánchez Delgado to make the statements which you have made part of your complaint. If the ongoing investigation corroborates the information, you have committed some serious crimes indeed.

I hereby demand that you withdraw your complaint within the next seven (7) days, on or before June 7, with copy to me. Otherwise, I shall take the appropriate legal action against you.

Cordially,

Carlos Romero–Barceló

We note that Respondent Acevedo–Vilá cannot rely on Petitioner Romero–Barceló's statements in this letter to suggest that the FEC was constructively informed of the retraction of Sánchez–Delgado's statements. Petitioner's letter itself makes no mention of the retracted statements. Although Petitioner makes reference to "perjured statements," it is not clear, from the text of the letter, whether this is rhetorical license or references actual changes in the credibility of the sworn statements. The letter makes reference to local press information, supported by sworn statements corroborated by a polygraph expert. However, the letter does not signify who made the statements. All in all, while the letter certainly informs the FEC of additional allegations that bear on the circumstances of the complaint, it does not clearly impugn the credibility of the statements upon which the complaint is based.

On the same date, Respondent Acevedo–Vilá forwarded the letter to the FEC, claiming that "[Romero–Barceló's] conduct [was] highly irregular, if not illegal" because Romero–Barceló "threatened" to take legal action. Respondent Acevedo–Vilá requested that Romero–Barceló's letter be included as an additional document related to his complaint. Respondent Acevedo–Vilá also attached an affidavit, where he emphatically denied Sánchez–Delgado's accusations and denied having any participation in a scheme to defraud Romero–Barceló. Respondent Acevedo–Vilá made no reference to Sánchez–Delgado's March 16 and 24 disavowals of the sworn statements that constituted the evidence for the complaint as originally filed.

On June 23, 2000, Petitioner Romero–Barceló filed the instant petition, alleging that Sánchez–Delgado's sworn statements, which formed the foundation of the FEC complaint, were internally inconsistent. *Docket Document No. 1.* As such, he maintained that it was incumbent upon Respondent Acevedo–Vilá to take affirmative steps to verify the allegations before filing the FEC complaint and publicizing its allegations. Petitioner Romero–Barceló further alleged that Respondent Acevedo–Vilá, by publicly decrying the credibility of Sánchez–Delgado, irreparably undermined the basis of the FEC complaint, and that Respondent Acevedo–Vilá adamantly insisted upon pursuing the issue solely for the purpose of harassment. Accordingly, Petitioner Romero–Barceló contended that Respondent Acevedo–Vilá's failure to verify the veracity of Sánchez–Delgado's statements and his steadfast refusal to withdraw the FEC complaint was irresponsible, unethical, and a violation of 18 U.S.C. § 1001 (1999)[3] and Rule 8.4 of the Model Rules of Professional Conduct. MODEL RULES OF PROF'L CONDUCT R. 8.4.

On July 18, 2000, we issued a show cause order. *See Docket Document No. 3.*[4]

On July 19, 2000, Comptroller Díaz Saldaña reported that the sales of most DTCs carried out under Law 190 did not comply with standard regulations and parameters. Comptroller Díaz Saldaña identified irregularities in the sale process of most of the health facilities. However, Comptroller Díaz Saldaña also indicated that his office found no irregularities in Petitioner Romero–Barceló's behavior. Respondent Acevedo–Vilá did not apprise the FEC of this information.

On July 20, 2000, Respondent Acevedo–Vilá sent a letter to the FEC reporting that Sánchez–Delgado retracted his original statement under oath. Respondent Acevedo–Vilá again defends himself against Petitioner's allegations in the June 1, 2000 letter he submitted to the FEC, stating that he had been assured that he was not a subject of state investigation "because the reporter's sources have no credibility."

3. Section 1001 provides, in pertinent part:
 (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-
 (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
 (2) makes any materially false, fictitious, or fraudulent statement or representation; or
 (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
 shall be fined under this title or imprisoned not more than 5 years, or both.
 18 U.S.C. § 1001.

4. Although the order to show cause was entered before the conclusion of the preliminary investigation, we find that the sequence of events, in this case, have not affected Respondent Acevedo–Vilá's procedural rights, since the issues before us have remained constant.

On August 4, 2000, Sánchez–Delgado was charged with seventeen criminal felony charges for violation of the Puerto Rico perjury statute.[5]

On September 15, 2000, the FEC's Office of the General Counsel recommended that the file be closed and that "no action" be taken with respect to, *inter alia,* Carlos Rodríguez–Mateo, Domingo García, Carlos Romero–Barceló, and Romero–Barceló's Election Committee. In addition, the Office of the General Counsel concluded that even if Sánchez–Delgado's statements were credible, "neither the statements nor other information on the public record indicate that the $175,000 payment was a campaign contribution." In addition, the General Counsel's report reflects that "no record of contribution to Carlos Romero–Barceló either individually or in a lump sum" approaches the sum of $175,000, and that "there is no information that the $175,000 . . . was intended or used for Carlos Romero–Barceló's campaign . . . ." On September 22, 2000, the FEC in a vote of 6–0 adopted and approved the General Counsel's determination to dismiss the complaint, a decision which Respondent Acevedo–Vilá did not seek to review.

Respondent Acevedo–Vilá twice moved to dismiss the present petition in August and September 2000, *see Docket Documents Nos. 4 and 22,* motions which we denied. *See Docket Documents Nos. 5, 11, and 25.* On September 11, 2000, we ordered Magistrate Judge Castellanos to conduct a limited, preliminary investigation into Petitioner Romero–Barceló's allegations. *Docket Document No.4.* On September 15, 27, and 28, 2000, Magistrate Judge Castellanos conducted a hearing to determine the sufficiency of the evidence with regard to whether Respondent Acevedo–Vilá knew or should have known about the unreliable character of Sánchez–Delgado's allegations. The following witnesses testified during this hearing: Petitioner Romero–Barceló; Respondent Acevedo–Vilá; Dr. Rodríguez–Mateo; Domingo García; Migdalia Rivera–Pizarro, an employee, at the time of the hearing, of local NPP Senator Ramón Luis Rivera, Jr.; Ombudsman López Méndez; Héctor Santiago–Rivera, an attorney consulted by Sánchez–Delgado; José Gil Colón–Rodríguez, an associate of Sánchez–Delgado; Celeste Benítez, an individual implicated by Colón–Rodríguez in allegedly conspiring with Sánchez–Delgado; Carlos J. Ruiz–Nazario, Chief of Staff for Respondent Vilá Acevedo–Vilá at the time of the hearing; Ferdinand Mercado, Secretary General of the PDP at the time of the hearing; David Rivé–Power, Campaign Director for the PDP "Sila 2000" Committee; Víctor Rivera–Hernández, Executive Assistant to the President of the PDP at the time of the hearing; and Efraín Rivera–Carlos, a process server. At the conclusion of the hearing, the Magistrate found that there was sufficient evidence to continue disciplinary proceedings against Respondent Acevedo–Vilá. *See Docket Document No. 46.*

After having thoroughly reviewed the Report and Recommendation issued by Magistrate Judge Castellanos, we issued an Opinion and Order on February 9, 2001, in which we concluded that a formal disciplinary proceeding was required under Local Rule 211, and that Respondent Acevedo–Vilá was to be given "the opportunity to show cause why disciplinary action is not merited in his case." D.P.R. LOCAL R. 211.5(B).[6] We appointed Magistrate

---

**5.** Sánchez–Delgado pled guilty to all seventeen charges on September 4, 2002. He was sentenced on March 13, 2003.

**6.** The Local Rule provides: "If after investigation, the Court determines that disciplinary proceedings are warranted, it shall issue an order requiring the respondent-attorney to

Judge Aida Delgado–Colón, Steven C. Lausell, Esq., and Rafael Pérez–Bachs, Esq., to a panel ("the Panel") to determine whether Respondent Acevedo–Vilá knew or should have known on October 12, 1999, that the principal basis for his FEC complaint, *i.e.*, Sánchez–Delgado's sworn statements, lacked credibility, and whether Respondent Acevedo–Vilá informed the FEC in a timely fashion about the changing nature of his information and belief regarding the veracity of Sánchez–Delgado's statements. Later, Pérez–Bachs resigned. We ordered the two-member Panel to review the entire record as it existed, and to hold a hearing in which witnesses may be called and cross-examined and to make, upon a clear and convincing evidence standard, detailed findings of fact with regard to two material issues. We also ordered the Panel to recommend what disciplinary action, if any, the court should take against Respondent Acevedo–Vilá, and the reasons for such action. We reminded the panel that the Bar of this court, rather than Petitioner Romero–Barceló or Respondent Acevedo–Vilá, carries the burden of proof.

In accordance with our Order, hearings were held June 3, June 4, and July 31, 2002, before Panel members Attorney Steven Lausell and Magistrate–Judge Aida Delgado–Colón, during which Respondent Acevedo–Vilá was afforded the opportunity to present and cross-examine witnesses. Several witnesses testified at the hearing conducted before the Panel: Attorney David Rivé–Power, Attorney Carlos Ruíz Nazario, Ferdinand Mercado, Víctor Rivera Hernández, Charles E. Figueroa Alvarez, Héctor Santiago, Attorney David Noriega, and Attorney Nicolás Nogueras.

On April 13, 2003, the Panel issued its Report and Recommendation. *Docket Document No. 63.* The Panel summarized the factual background of the events in question, and tackled the two issues we had

show cause why disciplinary action should

presented for its consideration. As to the first, whether Respondent Acevedo–Vilá knew or should have known on October 12, 1999 that Sánchez–Delgado's sworn statements lacked credibility, the Panel found that

> [t]he context of the sworn statements, which raised the specter of ulterior motives of both Sánchez–Delgado in signing them and Attorney Nogueras in providing them to Acevedo–Vilá; the content of the sworn statements in which no reference is made to political campaign contributions regarding Romero–Barceló; and the credibility of Sánchez–Delgado which was called into question by members of Acevedo–Vilá's own political party, all convince this Panel that Acevedo–Vilá knowingly misrepresented the truth in filing the complaint before the FEC and publicized the filing in order to mislead the voters and gain political advantage over his political adversary, Romero–Barceló.

*Docket Document No. 63.*

The Panel was unconvinced by Respondent's efforts at corroborating Sánchez–Delgado's statements. First, the Panel noted that no date was provided for Domingo Garcia's admitted intervention on behalf of Dr. Rodríguez Mateo on the sale of the Salinas DTC, and that Petitioner Romero–Barceló stated that this type of intervention did not materially differ from assistance his office gave to all his constituents. Furthermore, Petitioner Romero–Barceló asserted that he did not remember discussing the matter personally with Dr. Rodríguez Mateo.

Second, the Panel noted that sales of DTCs under their appraisal value were legal, and that this, in and of itself, did not support an inference that the sales were

not be taken." D.P.R. LOCAL R. 211.5(B).

being conducted as part of a scheme to divert funds to NPP campaign coffers.

Third, the Panel found that Respondent's confirmation of Sánchez–Delgado's statement that Domingo García was limping sometime in 1998 was "easily detectable by third parties and in no way added credibility to Sánchez–Delgado's statements."

Fourth, the fact that Petitioner Romero–Barceló had provided Dr. Rodríguez Mateo with an invitation to the Inaugural Ball for President Clinton in January 1997 did not sustain a finding of an alleged campaign contribution concurrent with the May 1998 Salinas DTC sale.

Fifth, the Panel noted that Respondent confirmed and made public that Dr. Rodríguez Mateo or persons related to him had made political contributions to Petitioner. However, the Panel noted that Respondent failed to note that those contributions had been reported to the FEC, were within the statutory maximum limits and, therefore, legal. They also questioned Respondent's characterization of 1996, 1997, and 1998 contributions as "contemporaneous" to the May 1998 sale.

Finally, the Panel considered the fact that Dr. Rodríguez–Mateo's father was part of Petitioner's security detail escort. "Even if true," the Panel found, "this is not illegal, per se, nor is it relevant to the assessment of Sánchez–Delgado's credibility or the veracity of his allegations as these are related to Romero–Barceló." *Id.* The Panel observed that Dr. Rodríguez–Mateo's father had been employed by Romero–Barceló since 1976, which predated the sale of the Salinas DTC by twenty-two years.

As to our second question, whether Respondent informed the FEC in a timely fashion about the changing nature of his information and belief regarding the veracity of Sánchez–Delgado's statements, the Panel found that "[d]uring March 2000 Acevedo–Vilá knew and had publicly admitted that the sworn statements on which the FEC complaint was premised had been contradicted and recanted by Sánchez–Delgado. At this time he should have taken timely action to advise the FEC." The Panel noted that in June 1, 2000, Respondent Acevedo–Vilá informed the FEC that Petitioner sent him a letter requesting the dismissal of the FEC complaint, and yet failed to inform the FEC of Sánchez–Delgado's conflicting March 16 and 24 statements. The Panel found that this was an attempt by Respondent to "add heat to an investigation which had already become frivolous. Upon sending the June 1, 2000 letter, Acevedo–Vilá breached his ethical obligations by failing to disclose relevant subsequent developments and, thus, in effect misrepresenting the current state of affairs to the FEC." *Id.*

The Panel recommended that Respondent be publicly reprimanded for breaching his ethical obligations as a member of the Bar of this court in violation of Rules 3.1[7] and 8.4(a) and (c) of the Rules of Professional Conduct adopted by this Court.

On May 22, 2003, Respondent Acevedo–Vilá presented his objection to the Panel's Report and Recommendation. *Docket Document No. 70.* In his objection, Respondent challenges the procedure of this court and the findings of the Panel, alleging, *inter alia*, that this court lacks juris-

---

**7.** "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Model Rules Of Professional Conduct, Rule 3.1 (2003).

diction to entertain the disciplinary proceeding, that this court denied him due process, and that the Panel's findings are not supported by the evidence. *Id.* Respondent has raised some of these arguments previously in his motions to dismiss. *Docket Document No. 4.* In the interest of completeness, we will discuss each of Respondent's arguments in turn.

## II.

### *Legal Standard*

### A. *Disciplinary Proceedings*

██ "Any court which has the power to admit attorneys to practice may also sanction them for unprofessional conduct." *Standing Comm. on Discipline v. Ross,* 735 F.2d 1168, 1170 (9th Cir.1984). "In the federal system there is no uniform procedure for disciplinary proceedings." *Id.* The individual judicial districts are free to define the rules to be followed and the grounds for punishment. *See* 28 U.S.C. § 1654. Federal district courts are bound by the disciplinary rules they implement when proceeding against attorneys for violation of ethical standards. *Dailey v. Vought Aircraft Co.,* 141 F.3d 224, 230 (5th Cir.1998); *Matter of Thalheim,* 853 F.2d 383, 386, 388 (5th Cir.1988); *United States v. Stoneberger,* 805 F.2d 1391, 1393 (9th Cir.1986); *Matter of Abrams,* 521 F.2d 1094, 1104–05 (3d Cir.1975). Lawyers are subject to discipline for improper conduct in connection with business activities, individual or personal activities, and activities as a judicial officer. D.P.R. LOCAL R. 211.4(B) (rules of professional conduct will be applicable whether or not the act or omission occurred in the course of an attorney-client relationship or in the course of judicial proceedings); *Matter of Johnson,* 240 Kan. 334, 729 P.2d 1175, 1180 (1986); *State v. Russell,* 227 Kan. 897, 610 P.2d 1122, 1127 (1980). The Rules have also been held applicable to conduct in the heat of a public election campaign. *Rus-*

*sell,* 610 P.2d at 1127; *State v. Michaelis,* 210 Neb. 545, 316 N.W.2d 46, 53 (1982).

Rule 211.4 of the Local Rules of the United States District Court for the District of Puerto Rico provides the procedure that we must follow when misconduct or allegations of misconduct by an attorney admitted to practice in this jurisdiction come before this court. *See Schneider v. Colegio De Abogados De P.R.,* 187 F.3d 30, 40 n. 16 (1st Cir.1999) (Lipez, J., concurring).

██ In the District of Puerto Rico, Local Rule 211.4 states that "[a]ny attorney admitted to practice before this Court may be disbarred, suspended from practice, reprimanded, or subjected to such other disciplinary action as the circumstances may warrant for misconduct defined in these Rules, and for good cause shown, and after notice and opportunity to be heard." D.P.R. LOCAL R. 211.4(A). The rules specify that any

> [a]cts or omissions by an attorney admitted to practice before this Court, individually or in concert with any other person or persons, which violate the [ABA Model Rules of Professional Conduct], shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship or in the course of judicial proceedings.

D.P.R. LOCAL R. 211.4(B).

Rule 211.5 states that when "misconduct or allegations of misconduct" are brought to the attention of the court, "the Judge shall refer the matter for investigation and the prosecution of a formal disciplinary proceeding or such other recommendation as may be appropriate." D.P.R. LOCAL R. 211.5(B). "If after investigation, the Court determines that disciplinary proceedings are warranted, it shall issue an order requiring the Respondent-attorney to show cause why disciplinary action should not be

taken, which order shall be served at the address registered with the Clerk of the Court." *Id.* "[A]fter the Respondent-attorney's answer to the order to show cause, . . . if any issue of fact is raised or the Respondent-attorney wishes to be heard, the Court shall set the matter for prompt hearing before one or more Judges of the Court or such other person or persons as the Court may designate." *Id.*

The First Circuit has clarified that an attorney facing disciplinary proceedings must be granted due process through notice and an opportunity to be heard. *In re Cordova–Gonzalez*, 996 F.2d 1334, 1336 (1st Cir.1993).

## B. *Rule 8.4*

Rule 8.4 of the Model Rules of Professional Conduct stipulates, in part, that "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." MODEL RULES OF PROF'L CONDUCT, R. 8.4 (2003).

■ The prohibition against false statements has been interpreted to include those statements that are knowingly false, as well as statements which, with ordinary care, would have been known to be false. *Michaelis*, 316 N.W.2d at 53–54; *In re Palmisano*, 70 F.3d 483, 486 (7th Cir.1995) (affirming reciprocal disbarment when state court had disbarred attorney for statements made in knowledge of their falsity or in reckless disregard of their truth or falsity); *Office of Disciplinary Counsel v. Price*, 557 Pa. 166, 732 A.2d 599, 604 (1999) (prima-facie case of violation of Rule 8.4 when misrepresentation

knowingly made, or made with reckless ignorance of the truth or falsity of the representation).[8]

■ In addition, courts have held that the rule against dishonesty can be violated by silence or a failure to speak, including conduct that involved no express misrepresentations but simply consisted of a failure to reveal underlying facts which might be necessary to avoid misleading someone. "A half-truth or silence can be as much a misrepresentation as a lie . . . [particularly when] they fail to advise the court of very important necessary information . . . . The necessity for complete candor when dealing with the court, particularly in an ex parte context, cannot be overemphasized." *In re Greene*, 290 Or. 291, 620 P.2d 1379, 1383 (1980) (the court held that the failure of the lawyer to inform the court of pertinent facts constituted misrepresentation which violated Oregon's analog of Rule 8.4); *see also* Bradley F. Tellam, *The Dishonesty RuleA Rule with a Future*, 74 Or. L.Rev. 665, 669 (1995) (compiling cases); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1386 (1977) (finding that an attorney's failure to reveal an agreement to the court and to opposing council violated the ethical rules).

■ The dishonesty rule has also been applied in instances where an attorney fails to correct innocently created misunderstandings of which a lawyer subsequently becomes aware and neglects to correct her own statements that were initially believed to be true but later revealed to be false. *In re Hubert*, 265 Or. 27, 507 P.2d 1141, 1141–1142 (1973) (an attorney was disciplined for his failure to correct an unintentional misstatement about the amount of fees that he had received from his client because of his subsequent failure

---

**8.** The *Price* court defined recklessness as the "deliberate closing of one's eyes to the facts that one had a duty to see or stating as fact

things of which one was ignorant." *Price*, 557 Pa. at 175, 732 A.2d 599.

to inform the court of the true facts, even though his client told him immediately after the hearing that his statement was false); *In re Williams*, 314 Or. 530, 840 P.2d 1280, 1283–1284 (1992) ("[a] misrepresentation can be made by making an assertion that is not in accordance with the truth when made … or by failing to correct a representation that, although true when made, is no longer true in the light of information later acquired ….").

## C. *Clear–and–Convincing–Evidence Standard*

 The clear-and-convincing-evidence standard has been recognized as the applicable standard in attorney discipline proceedings. *See Sealed Appellant 1 v. Sealed Appellee 1*, 211 F.3d 252, 256 (5th Cir.2000); *In re Medrano*, 956 F.2d 101, 102 (5th Cir.1992) (a court may discipline an attorney only upon the presentation of clear and convincing evidence); *Rosenthal v. Justices of the S.Ct. of Cal.*, 910 F.2d 561, 564 (9th Cir.1990) ("[t]he burden is on the state to establish culpability by convincing proof and to a reasonable certainty"); *In re Levine*, 675 F.Supp. 1312, 1318 (M.D.Fla.1986); *cf. In re Córdova–González*, 996 F.2d 1334, 1336 (1st Cir.1993) (citing *Rosenthal* for the procedural due process rights of a charged attorney in a disciplinary proceeding); *New England Ins. Co. v. Sylvia*, 783 F.Supp. 6, 10 (D.N.H.1991); *but see Palmisano*, 70 F.3d 483, 486 (7th Cir.1995) (adopting preponderance of the evidence standard). An attorney disciplinary proceeding does not require that civil or criminal liability be established. *Johnson*, 729 P.2d at 1180–1181.

 The Supreme Court has defined the clear and convincing standard "as that weight of proof which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' " of the case. *Medrano*, 956 F.2d at 102 (quoting *Cruzan by Cruzan v. Dir., Missouri Dep't. of Health*, 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (internal punctuation and citations omitted)).

## D. *Review of Prior Proceedings and Sanctions*

 Generally speaking, in reviewing a respondent's conduct through the record of disciplinary proceedings, we will defer to a panel's findings unless these are not supported by clear and convincing evidence. *In re Doyle*, 144 Ill.2d 451, 163 Ill.Dec. 515, 581 N.E.2d 669, 674 (1991); *see also Matter of Levine*, 174 Ariz. 146, 847 P.2d 1093, 1117 (1993) (recommendations of the committee are given "great weight"). However, the court is ultimately responsible for the imposition of sanctions.

 In making sanction recommendations, this court will use the American Bar Association's Standards for Imposing Lawyer Sanctions (1986) ("ABA Standards") as a basic, but not conclusive, guide. *Matter of Brady*, 186 Ariz. 370, 923 P.2d 836, 839 (1996) ("[a]lthough not mandatory, the ABA Standards are persuasive as to appropriate sanctions and provide a 'useful tool' in deciding the sanction to be applied."). Under the ABA Standards, a court contemplating sanctions should consider (1) the duty breached, (2) the attorney's mental state, (3) the extent of the actual or potential injury, and (4) other aggravating or mitigating circumstances. *Id.* at § 3.0. The standards make distinctions upon the level of conduct required for particular ethical violations. *Id.* The standards are adaptable, recognizing that "sanctions imposed must reflect the circumstances of each individual lawyer, and

therefore provide for consideration of aggravating and mitigating circumstances in each case." *Id.* at § 1.3.

The ABA Standards provide for disbarment when a lawyer "engages in ... intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law." *Id.* § 5.11(b). A reprimand is the appropriate sanction when a "lawyer engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law." *Id.* at § 5.13. ABA Standard 6.1 states that, with regards to false statements, fraud and representation, "[r]eprimand is appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding." *Id.* at § 6.1.

### III.

### *Analysis*

#### A. *Jurisdiction*

■ Respondent notes that the FEC has "exclusive jurisdiction over civil enforcement of federal campaign finance and election matters." *Docket Document No. 70.* From that premise, he argues that "the clear intention of this action brought by petitioner is to have this Court make a separate inquiry as to the same facts currently pending for investigation by the [FEC]" and that "the exercise of jurisdiction by this Court with relation to underlying facts under the exclusive purview of the [FEC] is illegal." *Id.*

■ The federal district courts have the authority to adopt and enforce local rules. The First Circuit identified three distinct sources for this authority.

First, Congress has empowered the Supreme Court to prescribe rules of practice and procedure for the federal courts. In turn, the Supreme Court has authorized district courts to craft local rules to implement, or fill gaps in, national rules of practice and procedure. Second, Congress has vested the lower federal courts with independent authority to prescribe local rules. Third, district courts have inherent power arising from the nature of the judicial process, and this power extends to certain types of rulemaking.

*Stern v. U.S. Dist. Court for Dist. of Mass.,* 214 F.3d 4, 13 (1st Cir.2000) (internal citations omitted).

■ In particular, a federal court has the "inherent power ... to control admission to its bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citing *Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824)). *See also Whitehouse v. U.S. Dist. Court for Dist. of Rhode Island,* 53 F.3d 1349 (1st Cir.1995). The First Circuit recognizes, moreover, the court's "duty and responsibility to supervise the conduct of attorneys who appear before it." *See Culebras Enterps. Corp. v. Rivera–Rios,* 846 F.2d 94, 97 (1st Cir.1988); *see also Greer's Refuse Serv., Inc. v. Browning–Ferris Indus.,* 843 F.2d 443, 446 (11th Cir.1988) ("federal courts have clear statutory authority to promulgate rules governing the admission and conduct of the attorneys who practice before them.").

For its part, "the FEC is an independent agency established by Congress to 'administer, seek to obtain compliance with, and formulate policy' with respect to the Federal Election Campaign Act of 1971 ("FECA") and chapters 95 and 96 of Title 26. 86 Stat. 3, as amended, 2 U.S.C.

§ 437c(b)(1)." *Fed. Election Com'n v. NRA Political Victory Fund,* 513 U.S. 88, 91, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994). The FEC has "exclusive jurisdiction with respect to the civil enforcement of such provisions." 2 U.S.C. § 437c(b)(1); *see Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 485, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).

However, the FEC's jurisdiction has not been interpreted broadly. In *Galliano v. United States Postal Serv.,* 836 F.2d 1362 (D.C.Cir.1988), the authority of the Postal Service to enforce its own prohibition against false representations was not preempted by the FEC's exclusive authority with respect to representations that were not specifically regulated by FECA, even if those representations were part of political campaign literature. *See Galliano,* 836 F.2d at 1369. The *Galliano* court relied on the principle that " 'a precisely drawn, detailed statute pre-empts more general remedies.' " *Id.* at 1367 (quoting *Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402, (1976)). The Postal Service could not enforce its regulation against false representations only where the particular representation at issue was also covered under FECA. *See id.* It follows that the FEC's exclusive authority is limited to the enforcement of specific provisions listed in 2 U.S.C. § 437c(b)(1).

Here, we are investigating a possible violation by Respondent, an attorney admitted to practice before the court, of Rules 8.4(a) and (c) of the Rules of Professional Responsibility. The alleged violation involves Respondent's filing of a complaint with the FEC accusing a political opponent of receiving illegal campaign contributions. Whether Petitioner Romero–Barceló violated federal electoral laws is not a matter before this court. Since both

candidates where running for federal office, such an inquiry is within the "exclusive jurisdiction" of the FEC, as it has the duty to enforce the statutes regulating federal elections. *See Galliano,* 836 F.2d at 1368. This court is concerned only with the alleged ethical violation. It is possible that, as part of its investigation of the possible ethical violation, the court would have reviewed some of the same documents or interviewed some of the same witnesses as the FEC.[9] This fact alone does not diminish our duty to investigate, nor does it affect our authority to do so. Perhaps if a provision against ethical violations by attorneys were part of FECA or of chapters 95 and 96 of Title 26 it could be argued that, as a function of 2 U.S.C. § 437c(b)(1), the FEC would have the exclusive authority to enforce the provision. *See id.* However, the court is not aware of such a provision. As a result, this court's authority to enforce our own Local Rules is untouched by FECA, and this matter is properly before us.

The matter before this court is the possible violation of a Local Rule. As shown *infra,* we have the authority to enact such rules and to enforce them. Consequently, this court has jurisdiction over this subject matter. Similarly, the court has jurisdiction over the Respondent's person in his capacity as an attorney admitted to practice before the court. The fact that the alleged ethical violation may involve Respondent Acevedo–Vilá's filing of a complaint with the FEC has no effect on the court's authority to review the alleged ethical violation and, if appropriate, to discipline Respondent. For the court to find otherwise would require the adoption of a new concept which absolutely precludes disciplinary action if a colorable argument could be made that the disciplinary action

---

9. The FEC complaint was dismissed on September 22, 2000, as Magistrate Judge Castellanos was conducting the preliminary hearing.

intersects factually with any judicial or agency proceedings. To the extent that Respondent's argument is an invitation to adopt such a concept, the invitation is declined.

## B. *Constitutional Issues*

### 1. *Nature of the Proceedings as Quasi–Criminal*

A fundamental premise of Respondent Acevedo–Vilá's attacks on the prior disciplinary proceedings is his contention, citing *In re Ruffalo,* 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), that attorney disciplinary proceedings are "quasi-criminal" in nature and that he is entitled to many of the rights enjoyed by criminal defendants, particularly the rights associated with due process.

■ Due process is a flexible concept. A determination of the particular process due depends on the nature of the proceedings and the interests at stake. *Goldberg v. Kelly,* 397 U.S. 254, 268–69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Although disciplinary proceedings are characterized as quasi-criminal, "the imposition of disciplinary sanctions itself implicates an independent and fundamental duty of the district court—the supervision of the attorneys who practice as members of its bar—in ways that other sanctions simply cannot." *Crowe v. Smith,* 151 F.3d 217, 230 (5th Cir.1998). Disbarment proceedings, rather than

> [a] resolution regarding the alleged criminality of a person's acts, [are] a determination of the moral fitness of an attorney to continue in the practice of law. Although conduct which could form the basis for a criminal prosecution might also underlie the institution of disciplinary proceedings, the focus is upon gauging an individual's character and fitness, and not upon adjudging the criminality of his prior acts or inflicting punishment for them.

*In re Daley,* 549 F.2d 469, 474 (7th Cir. 1977).

■ Thus, when faced with an attorney's challenge to his disciplinary proceeding premised on his claim to the Fifth Amendment's protection against self-incrimination, the *Daley* court found that

> [a] clear distinction exists between proceedings whose essence is penal, intended to redress criminal wrongs by imposing sentences of imprisonment, other types of detention or commitment, or fines, and proceedings whose purpose is remedial, intended to protect the integrity of the courts and to safeguard the interests of the public by assuring the continued fitness of attorneys licensed by the jurisdiction to practice law. The former type of proceeding is, in actuality, 'criminal' in nature and therefore within the ambit of the Fifth Amendment safeguards against self-incrimination; the latter is not.

*Id.* at 475; *see also Johnson,* 921 F.2d at 586 (disbarment proceedings "seek to determine the fitness of an official of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice."). Thus, "[a]lthough attorney discipline proceedings have been called 'quasi-criminal,' the due process rights of an attorney in a disciplinary proceeding 'do not extend so far as to guarantee the full panoply of rights afforded to an accused in a criminal case.'" *Cordova–González,* 996 F.2d at 1336 (quoting *Razatos v. Colorado Supreme Court,* 746 F.2d 1429, 1435 (10th Cir.1984)) (citations omitted); *see also Sealed Appellant,* 211 F.3d at 254–55 (quoting *Razatos* ); *Palmisano,* 70 F.3d at 486 (where state court had disbarred attorney using clear and convincing burden of proof, federal court declined to find that quasi-criminal nature of the proceedings required the federal court to

make an independent finding of. an ethical violation using a reasonable doubt burden of proof); *Rosenthal,* 910 F.2d at 564 (finding that a lawyer disciplinary proceeding is not a criminal proceeding and, as a result, protections normally afforded to a criminal defendant do not apply); *Matter of Disciplinary Proceedings of Phelps,* 637 F.2d 171, 176 (10th Cir.1981) (finding that, although the proceedings were quasi-criminal, the due process right to closing arguments extends only to criminal cases); *Daley,* 549 F.2d at 476 n. 6 (compiling cases).

 Rather, "an attorney facing discipline 'is entitled to procedural due process, including notice and an opportunity to be heard.'" *Id.* (quoting *Rosenthal,* 910 F.2d at 564); *cf. Dailey,* 141 F.3d at 229 (finding that the quasi-criminal nature of disciplinary proceedings demanded notice and opportunity to be heard); *Phelps,* 637 F.2d at 176 (holding that "the standard in [attorney disciplinary proceedings] is one of permitting the attorney a fair opportunity to present his case"); *Lowe v. Scott,* 959 F.2d 323, 335 (1st Cir.1992) (due process in proceeding to revoke physician's license requires notice of the charges and an opportunity to be heard). In fact, "that attorney discipline proceedings require proof only by clear and convincing evidence, as opposed to 'beyond a reasonable doubt,' is indicative of the mere quasi-criminal nature of such proceedings, which nature would not implicate all of the due process requirements attendant purely criminal proceedings." *Sealed Appellant,* 211 F.3d at 254–55.[10]

Consequently, inasmuch as Respondent Acevedo–Vilá is suggesting that the procedures here are insufficient because they do not grant him traditional measures of criminal due process, these arguments fail.

### 2. *Notice as Required by Due Process*

Respondent Acevedo–Vilá argues that he did not have notice of the charges against him, alleging that at the beginning of the formal proceedings Respondent had yet to be given notice of the violations that he had committed.

Petitioner's original complaint alleges misconduct in

(a) filing [the FEC complaint] under oath using three sworn statements he knew, or should have known, had false and fraudulent statements without at the very least confronting or questioning the source of the accusations; (b) in refusing to withdraw the complaint when he himself had been linked behind the scheme to smear Petitioner's reputation; and (c) in refusing to withdraw it when he has publicly stated that the source Sánchez has no credibility, grossly violates and contravenes the Model Rules of Professional Conduct and amounts to conduct unbecoming a member of the Bar of the Court.

*Docket Document No. 1.*

Moreover, Respondent acknowledges "Petitioner's complaint charged Respondent with violating Rule 8.4 of the Model Rules of Professional Conduct." *Docket Document No. 4.* Respondent avers, however, that this court impermissibly changed the nature of the charges against him, so much so that it constructively left Respondent without notice as to the exact basis of the proceedings against him. Respondent substantiates this by pointing to our written opinions. In our September 11, 2000 Opinion and Order, Respondent alleges that we charged him with an "intentional violation of Rule 8.4," ordering that an evidentiary hearing be conducted by a magistrate to determine whether "Re-

---

**10.** We note that in at least one circuit, evidentiary hearings are not absolutely required. *In* *re Evans,* 834 F.2d 90, 91 (4th Cir.1987).

spondent knew or should have known about the unreliable character of" the Sworn Statements which formed the basis of Respondent's FEC complaint. Respondent then states that we violated his due process rights, when, after the evidentiary hearing held by Magistrate Judge Castellanos, we ordered the Panel to determine whether Respondent timely informed the FEC of the "changing nature of the information" upon which the complaint was based. Finally, Respondent avers that the Panel's recommendation that Respondent be charged with not only Rule 8.4 but Rule 3.1 was the first instance in which he was given notice of a possible Rule 3.1 violation.

Respondent notes that the Supreme Court has held that an attorney must receive prior notice as to the "reach of the proceedings and the precise nature of the charges leveled" against him. *Id.; see Ruffalo*, 390 U.S. at 552, 88 S.Ct. 1222. Respondent contends that, as in *Ruffalo*, the court's clarification of the investigatory scope of the formal panel's hearing, and the Panel's invocation of Rule 3.1, constitute violations of his procedural due process rights.

In *Ruffalo*, an attorney in state disbarment proceedings did not have notice that his employment of an individual would be a disbarment offense until after both he and the individual had testified at length on all the material facts. Only after their testimony did the state bar add a charge premised on the testimony. The federal district court held that, notwithstanding the state bar's disbarment, there had been no misconduct, while the Court of Appeals disagreed and disbarred the attorney.[11]

The Supreme Court found that a "charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." *Id.* at 551, 88 S.Ct. 1222. We find that the facts here are distinguishable.

██ Although a petitioner brings misconduct proceedings to the court's attention, a court thus informed need not proceed with disciplinary proceedings as a petitioner does not have standing to control the disposition of the case or force the court's hand. At the point the petition is made the court becomes the disciplinary body, taking into account the real party in interest, the public. *See Statewide Grievance Comm. v. Botwick*, 226 Conn. 299, 627 A.2d 901, 906–907 (1993) ("once a complaint has been made against an attorney, the court controls the situation and procedure, as the interests of justice may seem to it to require.") (internal citations omitted). It follows, then, that a court apprised of misconduct need not limit itself to the charges or characterization of misconduct forwarded by the initial petitioner. It may, upon initial review and investigation, choose to modify the nature of the disciplinary proceedings, as long as it provides the respondent with notice of the alleged misconduct and an opportunity to respond.

We draw Respondent's attention to *Zauderer v. Office of Disciplinary Counsel of the Sup.Ct. of Ohio*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). In *Zauderer*, the Office of the Disciplinary Council of Ohio filed a complaint against an attorney alleging that several advertisements he had placed violated the rules of professional conduct. *Id.* at 633, 105 S.Ct. 2265. The complaint charged the attorney with, *inter alia*, issuing a "false" and "de-

---

**11.** Although practice before a federal court is derivative from an attorney's membership in a state bar, disbarment by the state is not conclusively binding on the federal courts. *Theard v. U.S*, 354 U.S. 278, 281–82, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957).

ceptive" advertisement because it offered legal representation on drunken driving cases on a contingency fee basis, an offer which the complaint alleged would run afoul of other professional rules of conduct. *Id.* Upon review of the complaint, the Board of Commissioners concurred that a violation of the rules had occurred. *Id.* at 634, 105 S.Ct. 2265. Its reasoning, however, differed from the reasoning in the complaint. The Board found the advertisement deceptive because its failure "to mention the common practice of plea bargaining in drunken driving cases, ... might be deceptive to potential clients who would be unaware of the likelihood they would both be found guilty (of a lesser offense) and be liable for attorney's fees (because they had not been convicted of drunken driving.)" *Id.* The attorney in *Zauderer* appealed, quoting *Ruffalo*, complaining that the change in the basis of his violation was a denial of procedural due process.

> Upon review, the Supreme Court stated: That the Board of Commissioners chose to make its recommendation of discipline on the basis of reasoning different from that of the Office of Disciplinary Counsel is of little moment: what is important is that the Board's recommendations put appellant on notice of the charges he had to answer to the satisfaction of the Supreme Court of Ohio. Appellant does not contend that he was afforded no opportunity to respond to the Board's recommendation; indeed, the Ohio rules appear to provide ample opportunity for response to Board recommendations,

and it appears that appellant availed himself of that opportunity.

*Id.* at 654, 105 S.Ct. 2265.

The Court was not persuaded by the attorney's suggestion that he was prejudiced by his inability to counter the Commission's conclusion that it was common practice for persons charged with drunken driving to plead to lesser offenses. It noted that the attorney was not precluded from arguing that judicial notice of those facts was inappropriate during the proceedings. *Id.* at 655 n. 17, 105 S.Ct. 2265.

Finally, the Court found that the attorney's reliance on *Ruffalo* was misplaced. Although the majority in that case did hold that a change in the charges against the petitioner during proceedings before the Ohio Board of Bar Commissioners violated due process, the feature of that case that was particularly offensive was that the change was such that the very evidence put on by the petitioner in defense of the original charges became, under the revised charges, inculpatory. Thus, in that case, the original charges functioned as a 'trap,' for they lulled the petitioner into presenting evidence that 'irrevocably assur[ed] his disbarment under charges not yet made.' In this case, the variance between the theory of the Office of Disciplinary Counsel and the Board of Bar Commissioners had no such prejudicial effect on appellant.

*Id.* at n. 18 (internal citations omitted).[12]

Under this standard, the Panel's finding of a 3.1 violation, if accepted by this court,

---

**12.** Other cases are similarly instructive. In *State Bar Assoc. v. Wenger*, 454 N.W.2d 367 (Iowa 1990), a commission attempted to charge an attorney under disciplinary review for failure to pursue his client's claim and failure to respond to the disciplinary board's inquiries regarding the matter. At the end of the disciplinary proceeding, the commission charged the attorney with the independent offense of giving false testimony under oath, contending that the truth or falsity of the correspondence submitted to the commission was "inextricably intertwined" with the charge that the attorney failed to cooperate with the commission's proceedings. Therefore, the commission reasoned, the attorney "could not claim that he was not on notice that false testimony in this regard would sub-

would not comport with due process. First mentioned at the end of the formal proceedings, the additional charge does not allow Respondent to craft a rule-specific defense or provide evidence to counter that specific charge.

However, we find that Respondent has had ample notice and opportunity to face the charge of a Rule 8.4 violation. After Petitioner's motion, Respondent filed motions to dismiss, *Docket Document Nos. 4, 22*, which this court considered and denied. *Docket Document Nos. 5, 25.* Subsequently, we referred Petitioner Romero–Barceló's petition for an evidentiary hearing to determine if Petitioner Romero–Barceló's grievance had merit, after which Respondent was allowed to submit a brief. *Docket Document No. 39.* Formal hearings were held before Magistrate Judge Aida Delgado–Colón and Attorney Steven Lausell, where Respondent was granted an

opportunity to present evidence and a defense against the charges. Respondent Acevedo–Vilá received proper notice of the formal disciplinary proceeding, and he was granted more than a year to prepare his defense. Finally, he was served with the Panel's Report and Recommendation, to which he submitted an opposition. *Docket Document No. 67.* In short, "the treatment accorded [Respondent] provided him with a pointed example of the fairness of the court whose integrity his conduct had endangered." *Phipps v. Wilson,* 186 F.2d 748, 751 (7th Cir.1951).

### 3. *Challenge to Evidentiary Hearing*

### a. *Participation of Petitioner in Proceedings*

■ Respondent Acevedo–Vilá complains that in the hearing before Magistrate Castellanos, "Petitioner Romero–Barceló actively participated as a party in

---

ject him to disciplinary action." *Id.* at 369. The Supreme Court of Iowa refused to allow the amendment of the complaint against the attorney. It found that the "failure to respond charge and the amended charge of false testimony 'are two different, distinct, and unrelated incidents of misconduct of which [the attorney] had notice of only one." *Id.* Citing *Ruffalo,* the court found that the belated amendment would work to deprive the attorney of his due process rights because it would not grant Respondent an opportunity to counter the allegations. However, rather than discharging the claims of false testimony, the court allowed the commission to proceed with the investigation of charges of false testimony, allowing the attorney an opportunity to respond to the commission's charge. *Id.* at 370. In *In re Doyle,* the Supreme Court of Illinois refused to discipline an attorney for his prelitigation activities because the complaint did not inform the attorney that these activities were at issue. The court found that in its previous jurisprudence it had established that "a complaint must contain factual allegations of every fact which must be proved in order for the [Plaintiff] to be entitled to judgment on the complaint, and a judgment cannot be rendered on facts demon-

strated by evidence at trial unless those facts were alleged in the complaint." *In re Doyle,* 163 Ill.Dec. 515, 581 N.E.2d at 678 (internal citations omitted). In *Bar Assoc. v. Johnson,* 447 F.2d 169 (3d Cir.1971), the court declined to add a charge that the disciplined attorney had violated his attorney client relationship when the only notice of a possible charge came after two days of hearings and after the attorney had testified at length concerning the relationship between him and his client. *Id.* at 173. The court noted that "[d]ue process contemplates notice which gives a party adequate opportunity to present his case." Quoting *Ruffalo,* the *Johnson* court found that "[i]n these circumstances, respondent was entitled to know the exact nature of the charges against him before the commencement of proceedings." *Id.* The court also invalidated another charge, since it "was not contained in the complaint; nor was there any other warning to respondent that he would have to answer to such a charge." *Id.* These cases do not differ in reasoning from *Zauderer.* In each, the vital element of the due process violation was the attorney's inability to defend against the charges facing him.

interest, and represented by counsel, during the preliminary investigation and the adjudicatory hearing before a panel appointed by the Court .... It is a matter of settled law that a private citizen has neither the right to initiate nor the right to participate in disciplinary proceedings." *Docket Document No. 70.* Respondent Acevedo–Vilá cites various cases to substantiate his argument.

The cases cited by Respondent Acevedo–Vilá stand for a different proposition. In all these cases, the petitioners attempted to reinstate or force disciplinary proceedings that had been dismissed by the court. The courts did not find, as Respondent Acevedo–Vilá seemingly alleges, that participation by a petitioner is prohibited and nullifies the proceedings. Instead, as discussed briefly *supra*, the courts found that a petitioner may not intervene or impose himself into the proceedings without leave of the court or disciplinary body in charge of the proceedings.

■ In the seminal case providing for a lack of standing on the part of private litigants, *Mattice v. Meyer*, 353 F.2d 316 (8th Cir.1965), a private person filed a complaint to have the Attorney General of Nebraska disbarred, alleging an ethical violation. The Court stated that private citizens lack standing at law to maintain a disciplinary proceeding as a formal action in the district court and, furthermore, lack standing to institute an appeal if the court declines to discipline the attorney. In other words, consonant with *Mattice*'s

holding, an individual may not institute a disciplinary proceeding as a civil or criminal action, acting as a plaintiff and directing the prosecution of the case. The court fell short of prohibiting an individual from either bringing the allegedly unethical conduct to the court's attention or from participating in the proceedings as an informant. In fact, the court clarified that an individual may file a petition that "'invokes the inherent power of the courts to maintain the integrity of the bar and to see that courts and its members do not fall into disrepute with the general public through unprofessional or fraudulent conduct.'" *Id.* at 319 (quoting *Ginsburg v. Stern*, 125 F.Supp. 596, 603 (W.D.Pa. 1954)). Quoting *Ginsburg*, the court continued:

> Plaintiff's petition, just as any other complaint of professional misconduct, merely supplied information for the court's consideration. If the court considers that no offense has been committed; or that the allegations of the complaint are insufficient, immaterial, impertinent or scandalous; or that the complaint has been filed from an improper motive; or for any other reason decides not to proceed with the matter, the petitioner has no recourse.

*Id.*

Thus, *Mandanici* stands for the limited proposition that, after handing over the petition, "the individual may not exercise control over the proceedings of the court. Further action, if any, becomes the responsibility of the court." *Starr v. Mandanici*, 152 F.3d 741, 748 (8th Cir.1998).[13]

---

**13.** In another case cited by Respondent Acevedo–Vilá, *Akinaka v. Disciplinary Bd. of Hawaii Supreme Court*, 91 Hawai'i 51, 59, 979 P.2d 1077 (1999), the court found that an individual who had filed complaints against attorneys did not have standing to bring suit to compel the disciplinary board to initiate disciplinary proceedings. The individual's "only function, as the Petitioner, in the disciplinary process is to supply evidence of the alleged attorney malfeasance to [the disciplin-

ary body.]" *Id.* "To conclude otherwise," the court continued,

> [w]ould mean that petitioners, who have no actual stake in the outcome of disciplinary proceedings, could force [the disciplinary body] to conduct a full-scale investigation and hearing into every complaint it receives, regardless of whether that complaint is unfounded or frivolous. This would not only be an absurd waste of time and re-

In the case at bar, Petitioner Romero–Barceló's grievance, although submitted as a formal complaint, merely supplied information for the court's consideration.[14] Magistrate–Judge Castellanos' Report explicitly states that both Petitioner Romero–Barceló and Respondent Acevedo–Vilá were asked to participate in the initial hearing in an effort to "assist [Magistrate Castellanos] in submitting questions and developing the issues for the record."[15] *Docket Document No. 46.* Petitioner's participation was limited to that preliminary hearing, and did not extend to the formal disciplinary hearing before the appointed Panel. That limited participation in the investigatory proceedings, which served to determine whether there were grounds to pursue more formal proceedings, differs materially from an attempt on the part of a petitioner to force or control the disciplinary proceedings. We decline Respondent's invitation to find that substantial participation on the part of a petitioner at the behest of a disciplinary body constitutes a violation of due process.

### b. Due Process at the Investigatory Stage

In his objection, Respondent Acevedo–Vilá mentions that he raised several objections during the previous proceedings, both before Magistrate Judge Castellanos and the Panel. He contends that the proceedings before Magistrate Judge Castellanos were incomplete, allowed false evidence, and were conducted without the guarantee of due process. *Docket Document No. 70.* Respondent avers that the whole proceeding before Magistrate Judge Castellanos was based on evidence gathered without having the opportunity to cross-examine or confront the evidence and, therefore, the evidence could not be used during the formal proceedings in

---

sources, but it would also effectively usurp the discretionary authority that [the disciplining body] has in considering whether to prosecute an ethics complaint against a lawyer, and would also distort the aim and purpose of the disciplinary process. . *Id.* (internal citations omitted). As in *Mandanici,* the court did not prohibit the participation of a petitioner in disciplinary proceedings. Instead, it found that a court could not be forced to take disciplinary action by a petitioner if it chose not to. *Id.; see also Ramos Colon v. United States Attorney for the Dist. of P.R.,* 576 F.2d 1, 2, 6, 9 (1st Cir.1978) (a former defendant "cannot challenge the court's decision not to discipline.... It remains for the court to vindicate its authority, if it so chooses."); *Application of Phillips,* 510 F.2d 126, 126 (2d Cir.1975) (per curiam) (pro se litigant could not compel court to sanction opposing counsel because "a private person ... has no standing to participate in a disciplinary proceeding.").

**14.** The Local Rules of the District of Puerto Rico stipulate that allegations of misconduct may be brought to the court's attention "by complaint or otherwise." D.P.R. LOCAL R. 211.5(A). We also note without highlighting that an attorney who has "knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." MODEL RULES OF PROFESSIONAL CONDUCT, R. 8.3 (1983). A rule that prohibits a petitioner, particularly an attorney, from bringing misconduct to the court's attention would be unworkable.

**15.** During the hearing, Magistrate Judge Castellanos observed:

I will have to say that I was doing some preliminary research on the matter of getting the assistance of counsel conducting the investigation. There is nothing wrong for me doing that, at least that is my impression. So [Respondent's counsel] will have the same opportunity and you as well. There's a lot of detail and evidence that I'm not familiar with at this particular moment. I think in order to conduct this investigation, I will allow you to help the Court in doing so.

Hearing before Magistrate Judge Castellanos, Friday, September 15, 2000, p. 2.

front of the Panel, or as part of the determination by this court.

■ It is well settled that full due process rights do not attach at investigatory stages that do not directly affect or adjudicate rights of an individual. *S.E.C. v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984). As the Supreme Court clarified in *Hannah v. Larche,*

> [w]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.

363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (holding that the Commission of Civil Rights did not have to inform the targets of its investigation of the specific charges, the identities of the complainants, or allow the targets to cross-examine witnesses).

■ Attorneys who will be "accorded all the traditional judicial safeguards at a subsequent adjudicative proceeding ... should some type of adjudicative proceeding subsequently by [sic] instituted," cannot successfully complain that they were not provided with the procedural due process at an investigatory hearing. *Id.* at 446, 80 S.Ct. 1502; *see also Georator Corp. v. Equal Employment Opportunity Comm'n*, 592 F.2d 765, 768–69 (4th Cir. 1979) ("[w]hen the preliminary determination is without legal effect in and of itself, due process will be satisfied if there is an opportunity to be heard before any final order of the agency becomes effective"); *Ewing v. Mytinger & Casselberry,*

339 U.S. 594, 598, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (stating that the court has "repeatedly held that no hearing at the preliminary stage is required by due process as long as the requisite hearing is held before the final order becomes effective"); *Matter of Ellis*, 504 N.W.2d 559, 562–63 (N.D.1993)(fact that attorney was not given notice and did not appear at preliminary investigatory hearing was not a violation of due process when the initial proceeding was followed by more formal disciplinary proceedings); *Terrell v. Miss. Bar*, 635 So.2d 1377, 1383–84 (Miss.1994) (the fact the record contained no evidence of service of process and attorney was not given opportunity to cross examine witnesses during precomplaint investigative proceedings did not result in due process violation).

The reasoning behind these cases is clear. A respondent will be able to receive his constitutionally guaranteed due process if and when the initial investigation leads to formal proceedings. The investigatory process

> [c]ould be completely disrupted if investigative hearings were transformed into trial-like proceedings ... Fact-finding agencies without any power to adjudicate would be diverted from their legitimate duties and would be plagued by the injection of collateral issues that would make the investigation interminable. Even a person not called as a witness could demand the right to appear at the hearing, cross-examine any witness whose testimony or sworn affidavit allegedly defamed or incriminated him, and call an unlimited number of witnesses of his own selection. This type of proceeding would make a shambles of the investigation and stifle the agency in its gathering of facts.

*Hannah*, 363 U.S. at 443–44, 80 S.Ct. 1502.

Consequently, Respondent Acevedo–Vilá was not denied due process when he was

not offered the equivalent of a full formal hearing in the investigatory hearing stage. He was allowed to counter the evidence with his own, and file briefs for the Magistrate Judge's consideration. Afterwards, he had a full year to prepare for a formal hearing where he could present evidence and testimony to counter the evidence compiled in the evidentiary hearing. Simply put, Respondent Acevedo Vilá had an opportunity to review and respond to the evidence against him. His procedural challenge to the evidentiary hearing here is unpersuasive.[16]

### c. *Confrontation of his Accuser*

Respondent Acevedo–Vilá argues that he did not have the opportunity to face his accuser, Petitioner Romero–Barceló, during the hearing by Magistrate Judge Castellanos. He avers that this violated his Sixth Amendment right to confrontation.

■■■■■ "The confrontation clause is a criminal law protection." *Rosenthal,* 910 F.2d at 565. As such, it does not apply to an attorney disciplinary proceeding. *Id.* Further, disbarment proceedings are not criminal proceedings, and relaxed rules of evidence apply. *Florida Bar v. Vannier,* 498 So.2d 896, 898 (Fla.1986) (finding that "in bar discipline cases, hearsay is admissible and there is no right to confront witnesses face to face. The referee is not barred by technical rules of evidence."); *Matter of Calvo,* 88 F.3d 962, 967 (11th Cir.1996) (citing *Vannier,* 498 So.2d at 898).

Here, we find no evidence that Respondent Acevedo–Vilá attempted to call Petitioner Romero–Barceló to the stand. Further, while Respondent Acevedo–Vilá is being subjected to disciplinary proceedings premised on Petitioner's grievance to this court, Respondent has not suggested how Petitioner Romero–Barceló's testimony would have been pertinent to the proceedings at bar. Respondent seems to suggest that the Panel needed to recreate the evidentiary hearing so as to provide him with the opportunity to confront the evidence presented there, or forfeit consideration of the evidence. Given our discussion, *supra,* of the role of the investigatory evidentiary hearing, and the nature of disciplinary proceedings, we find no basis for such averments. Respondent Acevedo–Vilá had multiple opportunities to confront the evidence, the last of which was his objection to the Panel's Report and Recommendation here. His right to confront, challenge, and rebut the evidence has not been compromised.

### 4. *Challenges to the Panel*

■■■■ During the formal hearing, Respondent called into question the Panel's

---

16. We draw the Respondent's attention to the FEC's proceeding when handling his complaint against Petitioner Romero–Barceló. The FEC specifically provides that "once a complaint is filed, the Office of General Counsel reviews the complaint to determine whether it satisfies the filing requirements. Supporting Federal Candidates: A Guide For Citizens: Filing of a Complaint, *available at* http://www.fec.gov/pages/citn0011.htm *(July 23, 2003).* Within five days of filing a complaint, the FEC must notify the person accused of a violation of the Campaign Act in writing. *Id.* Unless the FEC dismisses the complaint on its own, it must give the respondent fifteen (15) days to demonstrate why the FEC should dismiss the complaint without any investigation. After the fifteen-day response period has elapsed, the Office of General Counsel evaluates and investigates the complaint, and if four out of six members vote affirmatively that there is reason to believe that the respondent violated the Campaign Act, the General Counsel must inform the respondent of the factual basis for its finding. *Id.* The respondent is given time to respond prior to an FEC vote on whether to make a finding of probable cause. *Id.* As here, an FEC respondent is not granted a right to full trial-type proceedings in the investigative stage of the complaint.

role in the proceeding, suggesting that the Panel was improperly engaging in a dual role as prosecutor and judge. Respondent suggests that this procedure denied him due process. As Justice Blackmun noted in *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842, (1971), "the advocate-judge-multiple-hat suggestion ... assumes too much and would bring down too many procedures designed, and working well ...." *Id.* at 410, 91 S.Ct. 1420. Similarly, Respondent Acevedo-Vilá's argument that the mere existence of various roles led to a biased hearing assumes too much. Disciplinary procedures are designed to give attorneys an opportunity to respond and defend against the charges made, and Respondent Acevedo-Vilá fails to proffer, and we do not find, any evidence to suggest that in this particular instance the process led to an unfair hearing in front of the Panel. Without more, we decline to find that Respondent Acevedo-Vilá was not afforded a fair hearing. *Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 15 (1st Cir.1988) (holding that the alleged prejudice of disciplinary hearings, in that case, university disciplinary hearings, must be based on "more than mere speculation and tenuous inferences"); *Cordova-Gonzalez,* 996 F.2d at 1336 (holding that the attorney's subjective impressions of bias or prejudice were insufficiently corroborated in the record).

### 5. *Constitutionality of Rules*

■ Respondent Acevedo-Vilá also challenges the Local Rules themselves. Respondent maintains that the disciplinary rules are unconstitutional, averring that these are too vague and, therefore, allow a judge too much discretion to establish proceedings at will. *Docket Document No. 70.*

■ A presumption of constitutionality attaches to enactments of a district court, such as the local rules here, and the burden is on the party challenging the enactment to demonstrate its unconstitutionality beyond a reasonable doubt. *People v. Morley,* 725 P.2d 510, 516 (Colo. 1986) (en banc). A disciplinary rule will not be found to be overbroad or vague and, hence, constitutionally infirm, when the subject of the rule is commonly understood by reasonable men and particularly by attorneys. *See Matter of Perrello,* 271 Ind. 560, 394 N.E.2d 127, 130-31 (1979).

The Local Rules in the District of Puerto Rico set out the procedure that we must comply with during attorney disciplinary proceedings. *See* D.P.R. Loc. R. 211. Simply alleging unconstitutionality, without precising the vagueness as applied to the proceedings at bar, is not enough.

### B. *Alleged Procedural Errors*

Respondent Acevedo-Vilá objects to this court's September 11, 2000 Opinion and Order, *Docket Document No. 4,* contending that we applied an incorrect standard to Respondent's motion to dismiss. Respondent cites our Opinion and Order and our assertion that "taking the Petitioner's assertions as true, as we must for the purposes of this motion to dismiss, we find that Respondent Acevedo-Vilá is not entitled to summary dismissal of this action." *Id.* Respondent Acevedo-Vilá alleges that this "eviscerated" any right to impartiality, as the "scales were tipped decidedly against the party with most to lose in favor of the party which had no standing in the proceedings," *Docket Document No. 70,* and cites *Mandanici v. Starr,* 99 F.Supp.2d 1019 (E.D.Ark.2000), for the proposition that we erred by accepting Petitioner Romero-Barceló's allegations as true. He notes that *Mandanici* states that a "person who files an ethics grievance has no standing as a party, and mere allegations of misconduct need not be accepted as true." *Id.* at 1028.

We find that *Mandanici* supports a different conclusion. In *Mandanici,* a petitioner requested that the district court appoint counsel to investigate allegations of prosecutorial misconduct by the Independent Counsel and his staff related to the investigation and subsequent impeachment of President Clinton. To determine whether it was obligated to refer the petitioner's request for investigation, the court first discussed the local rules and the petitioner's standing. The court clarified that the petitioner's involvement in disciplinary proceedings was limited to that of an informant, *id.* at 1025, and that, therefore, a petitioner had no recourse if the court decided not to proceed with the action. The court reasoned that a petitioner thus delimited would not be able to force an investigation upon an unwilling judiciary. The court interpreted the local rule as "permitting judges to exercise their discretion in evaluating the credibility of the allegation [prior to referring it to investigation], thereby providing a safeguard against the appointment of counsel to investigate baseless allegations founded on rumor, innuendo, prejudice or emotion." *Id.* at 1027. "Without the [local rules requirement] of specific evidence, the Court would be required to appoint counsel to investigate any allegation of an appearance of impropriety, creating the distinct likelihood of lengthy, costly and embarrassing ethical investigations that turn out to be totally without merit." *Id.* at 1027–28. The court went on to explain that:

> Unlike a party to a civil action, a person who files an ethics grievance has no standing as a party, and the mere allegation of misconduct does not need to be accepted as true. The initiation of a disciplinary investigation against a lawyer is a serious matter that should not be initiated by the Court based on innuendo or rumor. Requiring a citizen to substantiate an allegation of misconduct protects the courts and the Bar from the

> disruption caused by investigations of a frivolous nature.

*Id.*

The *Mandanici* court considered the nature of the allegations, the facts proffered by the petitioner, and the likelihood that the facts alleged and substantiated would lead to disciplinary action. *Id.* at 1028. It found that the informant had ample opportunity to substantiate the allegations, having at that point filed memoranda and "hundreds of pages of documents" to support his position. *Id.* Upon review of respondent's submission, it found that there was no support for the petitioner's allegation that the Independent Counsel or his staff solicited false testimony in order to incriminate President Clinton, and that the Independent Counsel did not suffer any conflict of interest.

Under Local Rule 211.5, when this court is made aware of misconduct, "which if substantiated, would warrant discipline on the part of an attorney," the court "shall refer the matter for investigation and the prosecution of a formal disciplinary proceeding or such other recommendation as may be appropriate." D.P.R. LOCAL R. 211.5(A). In our Opinion and Order of September 11, 2000, we reviewed the pertinent case law, its possible application to the allegations by Petitioner, and Respondent's position in his motion to dismiss, and ultimately found that, "if substantiated," Petitioner's allegations would support a finding of a Rule 8.4 violation. This initial investigation created a duty, as articulated in the Local Rules, to investigate the allegations in Petitioner Romero–Barceló's complaint. We note that we did not simply accept Petitioner's legal theories. Instead, in that initial review we found that a colorable ethical violation was possible upon proof that Respondent Acevedo–Vilá knew or should have known of the

falsity of the statements provided to the FEC.

Our words in denying Respondent's motion to dismiss, while reminiscent of the deferential motion-to-dismiss standard, did no more than to set in motion the procedures required by the local disciplinary rules. Our September 11, 2000 Opinion and Order served as a preliminary inquiry where we determined whether to continue with more formal disciplinary proceedings. Once we found that Respondent's conduct, if true, would fall within the legal definition of an 8.4 violation, we needed to institute further proceedings to determine if there was sufficient evidence to substantiate the allegations. The Local Rules are unequivocal.[17] Thus, while the language cited by Respondent implied we were making a determination based on wholesale acceptance of Petitioner's complaint, we actually only made a limited review consonant with the Rules. Stated differently, our result would have been the same had we not referenced the motion-to-dismiss standard.

## C. *Review of Panel's Findings*

Respondent Acevedo–Vilá claims that the evidence presented does not clearly and convincingly support a finding that he violated Rule 8.4. Respondent Acevedo–Vilá's attack is two-fold. First, Respondent argues that a finding of malfeasance requires us to find that he knew of the false nature of the Sánchez–Delgado statements when submitted to the FEC. Second, Respondent Acevedo–Vilá avers that there was no way that he could have known that Sánchez–Delgado was lying, and that this conclusion could have only been reached with hindsight and with the

level of investigation undertaken by this court.

### 1. *Rule 8.4*

Respondent Acevedo–Vilá alleges that clear and convincing evidence of a knowing misrepresentation or falsehood is necessary to find a violation of Rule 8.4. Respondent, in essence, is presenting yet another challenge to our September 11, 2000 Opinion and Order, where we first set forth the standard.

Rule 8.4 of the Model Rules of Professional Conduct stipulates, in part, that "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." MODEL RULES OF PROF'L CONDUCT, R. 8.4 (2003).

As we explicated, *supra,* a prima-facie violation of Rule 8.4(c) is made out where a "misrepresentation is knowingly made, or where it is made with reckless ignorance of the truth or falsity thereof .... [N]o actual knowledge or intent to deceive ... is necessary to establish a prima facie violation; the element of scienter is made out if Respondent's conduct was reckless, to the extent that he can be deemed to have knowingly made the misrepresentation.'" *Office of Disciplinary Counsel v. Anonymous Attorney A,* 552 Pa. 223, 714 A.2d 402, 407 (1998); *see also Levine,* 847 P.2d at 1117; *Michaelis,* 316 N.W.2d at 54; *Palmisano,* 70 F.3d at 486. In addition, conduct implicating dishonesty has been found in the presentation of half-truths, or silence, as to material facts.

---

**17.** The wording of the court's Local Rule 211.5 in this regard is not precatory, but mandatory throughout, stating that the court "shall," not "may," institute proceedings. *In*

*re Thalheim,* 853 F.2d 383, 387 (5th Cir. 1988). We must abide by the rules which we have promulgated. *Id.* at 388.

*Greene,* 620 P.2d at 1383; *Hiller,* 694 P.2d at 543–44; *see also Matter of Richards,* 123 N.M. 579, 943 P.2d 1032–1035 (1997) (appeal court finding that attorney's omission of material facts regarding the objections he made in trial was a misrepresentation "in an attempt to increase chances the court" would believe him.); *Neb. State Bar Ass'n v. Douglas,* 227 Neb. 1, 416 N.W.2d 515, 530–531 (1987) (finding that fraud may rise not only from misrepresentation but from concealment). The failure to correct a misrepresentation has also been found to be dishonest and a violation of ethical rules. *Hubert,* 507 P.2d at 1141–1142; *Williams,* 840 P.2d at 1283–1284.

### 2. *Adoption of the Panel's Findings*

■ Keeping in mind this standard, we briefly redact the Panel's findings here. As stated by the Panel, Respondent Acevedo–Vilá's FEC complaint alleged that Petitioner Romero–Barceló had received improper campaign contributions in violation of the limits imposed by the FEC. Respondent's allegations stemmed from Sánchez–Delgado's sworn statements. The Panel reviewed the reliability of Sánchez–Delgado's statements and whether these could have supported the allegations of campaign contribution violations and, therefore, Respondent Acevedo–Vilá's "belief".

The Panel first noted that Sánchez Delgado's statements had been made in preparation for the filing of a civil suit against Dr. Rodríguez Mateo. Sánchez–Delgado's attorney, Nicolás Nogueras, faxed the statements to Respondent Acevedo–Vilá because he felt they could help Respondent with his political campaign. Members of Acevedo Vilá's own party had denounced Sánchez–Delgado, alleging that he had offered false testimony previously. At the outset, therefore, Sánchez–Delgado's credibility was in question. The Panel observed that the statements were ultimately retracted by Sánchez–Delgado, and that Sánchez–Delgado was later prosecuted and convicted on September 4, 2002 for having provided perjured testimony implicating Petitioner Romero–Barceló, Domingo García, and others. Finally, the Panel noted Respondent's avowed state of mind at the time of his filing: "I don't know if this person is telling the truth, I just want someone to investigate. And if he is not telling the truth, he should be prosecuted." *Docket Document No. 48.*

In his defense, Respondent Acevedo–Vilá maintained that he examined the sworn statements and decided not to proceed until he could confirm facts contained therein. The Panel considered Attorney Ruiz' and Respondent Acevedo–Vilá's asseveration that at least six other facts presented in the sworn statements had been verified prior to the FEC filing. First, the Panel observed that while Domingo García admitted calling the GDB to inquire about the Salinas DTC sale, there was no actual date for that call. Furthermore, Petitioner Romero–Barceló attested that this assistance would not differ materially from the assistance that he would have given to other constituents and that he did not remember personally discussing the matter with Dr. Rodríguez–Mateo. Second, the fact that the Salinas DTC was sold at a price below market value was not found to substantiate Sánchez–Delgado's allegations, given the legality and commonality of such a practice. Third, Domingo García's limp during the time period was detectable by third parties and not conducive to a finding that Sánchez–Delgado's statements were true. Fourth, Petitioner's provision of 1997 Presidential Inaugural Ball tickets to Dr. Rodríguez Mateo was not temporally connected to the 1999 sale, and, while confirming the relationship between Petitioner and Dr. Rodríguez–Mateo, would not suggest the improprieties alleged by Sánchez–Delgado. Fifth, Dr. Rodríguez–Mateo's 1996, 1997, and 1998 statutorily-permissible contributions to Petitioner's campaign, while confirming

his NPP membership and support of a party candidate, did not suggest illegality. Sixth, the fact that Dr. Rodríguez Mateo's father was under Petitioner's employ for twenty-two years was also a confirmation of a relationship between both Petitioner and Dr. Rodríguez–Mateo, but in and of itself did not substantiate a finding of illegal activity. Finally, Sánchez–Delgado's knowledge of Dr. Rodríguez–Mateo's personal or family background was commensurate to his role as Dr. Rodríguez–Mateo's chauffeur.[18]

The Panel found that these corroborating facts suggest that Sánchez–Delgado

had some knowledge of Dr. Rodríguez–Mateo's personal life and, at most, that Dr. Rodríguez Mateo and Petitioner Romero–Barceló knew each other. As such, they did not materially sustain Respondent's allegations of fraud. The Panel concluded that Respondent Acevedo–Vilá simply did not engage in a reasonable inquiry to determine if the statements were true.[19] More importantly, however, the Panel determined that, even if the allegations in the statements were true, Respondent misrepresented the nature and content of the statements to the FEC and the public. The Panel determined,

---

18. The Panel also heard the testimony of Attorney David Noriega. Attorney Noriega testified that he conducted a radio interview with Sánchez–Delgado. He attested that he received a call from Respondent Acevedo–Vilá prior to the filing of the FEC complaint and that Respondent has asked him whether he felt Sánchez–Delgado was credible. Attorney Noriega also testified that he told Respondent that he and fellow Panelists found him to be credible. However, Attorney Noriega also testified that Respondent Acevedo–Vilá called him prior to his appearance before the Panel to "warn" him that he might be called to testify in front of the Panel, and that they had "recreated the content of the conversation." ["Second Conversation"] *Docket Document No. 48.* They did so "in order to make certain of what we had spoken about. You know, to be able to know exactly and make sure that this was the topic of conversation and so that we could come here and be able to tell the truth." *Id.*

The Panel noted that it had called Attorney Noriega in order to "hear his testimony about the conversation." *Docket Document No. 67.* Respondent's contact with Attorney Noriega to clarify the events, and to confirm the contents of the conversation, eviscerated the verification purpose of Attorney Noriega's testimony. Consequently, the testimony does not have the same weight as it would have had it been provided without the comparison conducted by Respondent and Attorney Noriega. This is of particular importance, because this conversation is the only evidence proffered by Respondent which suggests that he specifically investigated the credibility of Sánchez–Del-

gado. The content of the conversation and the actual information solicited by Respondent would have been particularly salient.

Even if we were to ignore this second conversation, we find that this would constitute Attorney Acevedo–Vilá's only effort to specifically investigate Sánchez–Delgado's credibility. Secondhand impressions of credibility seem woefully inadequate given the facts here.

19. We hesitate to determine, as a matter of law, what a proper inquiry would consist of, and what actions, if any, Respondent may have taken to uncover the truthfulness of Sánchez–Delgado's statements. We note, however, that Respondent did not contend that he, or his assistants, met with Sánchez–Delgado. Further, as observed by the Panel, not once during the proceedings did Respondent Acevedo–Vilá claim that he believed Sánchez–Delgado. Considering that Sánchez–Delgado's statements were not made for the purpose of detailing campaign contributions, but were, instead, made in an effort to institute civil proceedings against his employer for unrelated charges, a meeting may very well have elucidated or brought to light inconsistencies in Sánchez–Delgado's statements. We observe without highlighting that attorneys customarily interview witnesses before relying on the character of the testimony they will give. *Phelps,* 637 F.2d at 180. Given the nature of the FEC complaint here, Respondent's minimal corroboratory steps are incongruous with Respondent's goal of determining Sánchez–Delgado's truthfulness.

and we corroborate, that Sánchez–Delgado never stated that the money was a campaign contribution for Romero–Barceló's political campaign. Instead, Sánchez–Delgado describes the money as payment for Petitioner Romero–Barceló's intervention on Dr. Rodríguez Mateo's behalf in the sale of the Salinas DTC. The characterization of the money as a campaign contribution stems not from Sánchez–Delgado's statements, as Respondent Acevedo–Vilá asserts in his FEC complaint,[20] but from Respondent's own recasting of Sánchez–Delgado's statements.[21] Respondent does not explain this inconsistency, but the Panel noted that "it would have been

20. Respondent's FEC complaint states, in part:

[7]. According to several sworn statements given by Sánchez–Delgado, on or about August or September, 1998, Sánchez Delgado, pursuant to order from his employer, Dr. Rodríguez Mateo, delivered the amount of $175,000.00 to an assistant of the respondent, named Domingo Garcia, for respondent's political campaign.

8. Pursuant to information and belief, this was a political campaign contribution in violation of the limits imposed by the FECA. 2 U.S.C. § 441a.

9. According to the sworn statements given by Sánchez Delgado, the political contribution made by Dr. Rodríguez Mateo was in relation to or exchange for the respondent's assistance in the acquisition of Treatment and Diagnostic Clinic of Salinas for a price much lower than the actual market price.

Omitted from the quote above are Respondent's references to Sánchez–Delgado's sworn statements, reproduced below.

That on or about August and September, 1998, while I was at a New Progressive Party activity related to the 1998 Plebiscite, Dr. Rodríguez Mateo and I approached Carlos Romero–Barceló, to whom Dr. Rodríguez Mateo said: "Carlos, I have a gift for you. It's a little money. Since you helped me so much with this clinic deal. I have this for you." Carlos Romero responded: "all right!; I need them!". Then, Dr. Rodríguez said to me, "Andy, go to the car with Domingo Garcia, who is one of Carlos' assistants and get the Converse bag with Carlos' money and give it to him. Be careful, you know that there are $175,000.00 and things are not going well . . . ." FEC Complaint, Exhibit 1.

That on or about the months of August and September, 1998, while I was with the doctor we went to a political activity related to 1998 Plebiscite [sic], in which Carlos Romero–Barceló was the main speaker. At the end of the activity, we approached Carlos Romero and Dr. Rodríguez Mateo said to him: 'Listen, Carlos since you helped me with the C.D.T. of Salinas, doing your best at it I brought you this little gift, some money, $175,000 dollars, to which Carlos responded: 'All right, I need them.' FEC Complaint, Exhibit 2.

On the day that I was seen delivering the Converse blue bag with the $175,000 to Domingo Garcia, assistant to Carlos Romero–Barceló, Mr. Garcia was limping and using a walking stick . . . . FEC Complaint, Exhibit 3.

Respondent Acevedo–Vilá's characterization of the nature of the statements as campaign contributions is clearly not supported by the only evidence proferred, Sánchez–Delgado's sworn statements, appended as exhibits. In fact, in its dismissal of Respondent's complaint, the FEC stated that "[i]t is important to note that although the complaint alleges that the $175,000 in cash was a contribution in connection with Romero–Barceló's campaign for reelection, no reference to Carlos Romero–Barceló's campaign or his committee is contained in any of Sánchez–Delgado's affidavits." *Docket Document 67.*

21. Respondent Acevedo–Vilá's objection to the Panel's Report and Recommendation sheds additional light on his conclusion that the alleged "gift" was, in fact, a contribution to the NPP's campaign coffers. In his objection, Respondent complains that the Panel took judicial notice of facts that took place between 1999 and 2000, and yet "did not take judicial notice of several proceedings in this Court where the solicitation of bribery by [NPP] government officials has been proven as part of a scheme to divert monies to the political campaign of several politicians." *Docket Document No. 70.* He presented this chain of deductions as a hard fact, which misrepresented the pertinent evidence to the FEC.

clear, at least to an attorney, that the actions Sánchez–Delgado attributed to Romero–Barceló … if true, were matters to be investigated by state authorities (bribery or public corruption) but would have deprived the FEC of jurisdiction, unless those actions were labeled and characterized as 'political contributions.'" *Docket Document No. 67,* 2 U.S.C. § 437c(b)(1). Respondent Acevedo–Vilá's allegations in the FEC complaint were circumstantial and called for a process of deduction. Even if we were to assume a clear logic behind Respondent's characterization of Sánchez–Delgado's statements, Respondent omitted the reasoning from the FEC complaint and his public statements. As such, Respondent's omission of vital information only contributed to the misrepresentation. *See Phelps,* 637 F.2d at 180 (finding that the attorney had no hard facts upon which to base his contentions). In essence, Respondent made the critical mistake of "drawing and concluding far too much from limited evidence." *Id.* at 180 (considering similar behavior to be misrepresentation). This misrepresentation is unexplained by Respondent, and unreasonable in an attorney.

The Panel also found that Respondent Acevedo–Vilá's statement that he was frustrated by the state government's inaction in regards to his multiple requests to investigate DTC sales was unpersuasive. Amongst the evidence profered by Respondent himself are letters from the Puerto Rico Comptroller in which Respondent is assured that the Comptroller's office is heeding his requests. Regardless, while this frustration might explain Respondent's behavior, it certainly does not excuse it.

Finally, the Panel noted that Respondent's failure to attempt to withdraw his complaint, or to inform the FEC of Sánchez–Delgado's recantation in light of Respondent's own failing belief in Sánchez–Delgado's credibility was incomprehensible and inconsonant with his allegations that he was merely providing evidence for FEC review, especially since he had previously supplemented his complaint with circumstantial and unrelated evidence. Even assuming, *arguendo,* that Respondent had marshaled evidence that suggested the truth of Sánchez–Delgado's statements, and that he truly believed these when he first filed the complaint, he would still be under a duty to inform the FEC of the changing credibility of the statements. Once the statements were revealed as false, the continued reliance on them as a foundation of Respondent's complaint would be as unethical as if he had filed them in knowledge of their falsity from the outset. *See Williams,* 840 P.2d at 1284. We highlight that while Respondent did ultimately inform the FEC of Sánchez–Delgado's disavowal of his statements, he did so four months later. The Panel noted that, inexplicably, on June 1, 2000 Respondent forwarded Petitioner Romero–Barceló's withdrawal demand to the FEC on the day he received it, but failed to inform the Panel of Sánchez–Delgado's recantation in the letter. The delay in informing the FEC, both when the retractions happened, and when he was already filing other information with the FEC, only adds to the violation here.

The evidence compiled by the Panel, and essentially uncontested by Respondent, supports a finding that Respondent did not make a reasonable inquiry into the nature of Sánchez–Delgado's statements, misrepresented the relevant facts surrounding the statements, both to the FEC and the public, and failed to inform the FEC of the questionable nature of Sánchez–Delgado's statements when these were recanted. These misrepresentations violate Rule 8.4(a) and (c).

Respondent Acevedo–Vilá maintains that a reprimand in his case would chill legitimate legislative inquiries. In his objection to the Panel's Report and Recommendation, Respondent argues that the Panel is proscribing legitimate conduct, claiming that, in essence, the Panel found that evidence existed that the DTC sales were legal and, therefore, his insistence in pursuing his DTC investigations was meritless. Specifically, Respondent argues:

> The Panel seems to believe that once a law allows an action, it is right and no one has a right to question it, not even a legislator. Under their standard, when racial discrimination was legal in the United States there was no reason to object to it nor to make any fuss or attempt to change it.

*Docket Document No. 70.*

Respondent effectively broadens the findings of the Panel in his opposition, only to fault the Panel for his own broad construction. The Panel did not determine that Respondent Acevedo–Vilá inappropriately investigated the DTC sales and did not suggest that a legislator must accept the legality of a statute as the final word on the matter. However, the Panel did confirm that Respondent never mentioned that the DTC sales process allowed for below-market value sales. While irregularities may exist in the pattern or sales procedure, the Panel found that Respondent used the below-value sales as the crux of serious public allegations of fraud, without disclosing that these were facially legal. Coupled with Respondent's testimony during the hearing that he "just wanted someone to investigate," the Panel found that Respondent knowingly and recklessly misrepresented facts. To paraphrase the Panel, the fact that the sales were facially legitimate was a material fact not disclosed by Respondent Acevedo–Vilá, and not explainable if his ultimate goal was truthfulness. We applaud a legislator's efforts to uncover corruption wherever it may be hidden. To do so while hiding material facts, however, undermines the process, and Respondent's arguments here.

Respondent also objects to the Panel's finding that "even if Acevedo–Vilá had convinced [the] Panel that he actually believed Romero–Barceló had received an illegal payment of $175,000, such belief, based solely on the sworn statements of Sánchez Delgado and the facts allegedly 'corroborated' by Acevedo Vilá do not constitute 'reasonable belief' under the Rules of Professional Responsibility." *Docket Document No. 67.*

Respondent counters that "[u]nder this standard, if a lawyer sees a person standing with a gun in her hand and a dead person on the floor, and immediately hears the person stating 'I didn't kill him,' then it would not be reasonable for that person to believe that she was the killer." *Docket Document No. 70.* Again, Respondent misconstrues the Panel. The "reasonable belief" the Panel refers to here is a reasonable belief of campaign contribution violations. The Panel found that, even if they were to assume that Sánchez–Delgado's statements were reasonably credible, they did not support a "reasonable belief" that there were campaign contribution violations, since the sworn statements never characterized them as campaign contributions. If Respondent determined that these were campaign contributions based on their context, as suggested in his filings, he should have disclosed his inferences.

In sum, this court finds that the evidence here is clear and convincing that Respondent Acevedo–Vilá knew or should have known of the falsity of Sánchez–Delgado's statements, and that, given the actual content of the sworn statements, his representations of the statements led to unsupported allegations of campaign finance violations which misrepresented the

facts to both the FEC and the public. The court also concludes that the evidence is clear and convincing that Respondent failed to inform the FEC about Sánchez–Delgado's retraction of his sworn statements, even after he had determined that Sánchez–Delgado was no longer credible. These actions constitute violations of Rule 8.4(a) and (c).

### 3. *Proposed Sanction*

Although not mandatory, the ABA Standards provide a useful touchstone in deciding the sanction to be applied. The Standards suggest that a court imposing sanctions consider "(a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." ABA Standards § 3.0.

■■■ We briefly apply the ABA Standards to the circumstances here. The duty violated here was the duty of honesty and truthfulness. Respondent Acevedo–Vilá breached his duty to adequately investigate the truthfulness of the statements he presented to both the FEC and the public, while at the same time misrepresenting their content. Further, when the credibility of the statements came into question, so much so that Respondent admitted Sánchez–Delgado's lack of credibility, Respondent Acevedo–Vilá waited four months to inform the FEC. When asked to withdraw the complaint by the person it affected, Respondent forwarded Petitioner's letter to the FEC, characterizing it as a threat, while failing, once again, to inform the FEC of the retracted statements.

A violation of this duty strikes at the heart of the legal process, compromising the effective function of adjudicatory institutions, bringing disrepute to the bar, and implicating an attorney's character. As the Oregon Supreme Court stated in *In re Hiller*, "[a] person must be able to trust a lawyer's word as the lawyer should expect his word to be understood, without having to search for equivocation, hidden meanings, deliberate half-truths or camouflaged escape hatches. That trustworthiness is the essential principle embodied in [the dishonesty rule]." 298 Or. 526, 694 P.2d 540, 544 (1985).

Respondent's mental state at the time he filed the complaint in question, as culled from his statements, seems to be one of frustration. Respondent Acevedo–Vilá claimed that he felt that the NPP-controlled government was ignoring his requests for investigation into the DTC sales process. As Respondent stated during the hearing: "I don't know if this person is telling the truth, I just want someone to investigate. And if he is not telling the truth, he should be prosecuted." *Docket Document No. 48.*

Respondent Acevedo–Vilá's conduct was injurious. The FEC instituted an investigation into the allegations in Respondent's complaint, premised on questionable sworn statements that did not support a finding that the FEC even had jurisdiction over the matter. In addition, Respondent's June 1, 2000 letter appending Petitioner's withdrawal request squandered an opportunity, long overdue, to inform the FEC of Sánchez–Delgado's retraction, instead accusing Petitioner Romero–Barceló of additional malfeasance and prolonging the FEC inquiry.

Respondent Acevedo–Vilá's conduct also damaged the public. Throughout the relevant period, Respondent referenced Sánchez–Delgado's statements and repeated the allegations about the DTCs while omitting material facts. This, in the midst of an electoral campaign which was meant to determine both Respondent and Petitioner's fitness for electoral office. In the end, Respondent's conduct did nothing more than undermine the public's confidence in

its elected officials, and by extension, this Bar.

Moreover, it is beyond question that Respondent's conduct harmed Petitioner, who suffered through months of unfounded investigation into his behavior, as well as public excoriation.

While Respondent Acevedo–Vilá's conduct was injurious, there is no evidence that Respondent has been previously reprimanded or sanctioned by this court or any other. Further, various witnesses favorably testified about Respondent's character during the Panel hearing. Consequently, assessing the factors above, we believe that Respondent's conduct, while not rising to the seriousness of disbarment or suspension, deserves a public reprimand. "Reprimand, also known as censure or public censure, is a form of public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." ABA Standards § 2.5. As stated by the ABA,

> [a] reprimand is appropriate in cases where the lawyer's conduct, although violating ethical standards, is not serious enough to warrant suspension or disbarment. A reprimand serves the useful purpose of identifying lawyers who have violated ethical standards, and, if accompanied by a published opinion, educates members of the bar as to these standards.

*Id.*

### III.

### *Conclusion*

"The power of a court to impose appropriate and reasonable sanctions upon those admitted to its bar is a familiar phenomenon and lies within the inherent power of any court of record.'" *Flaksa v. Little River Marine Constr. Co.,* 389 F.2d 885, 889 n. 10 (5th Cir.1968) (quoting *Gamble v. Pope & Talbot, Inc.,* 307 F.2d 729, 735 (3d Cir.1962) (Biggs, CJ., dissenting)); *see*

*also Mandanici,* 152 F.3d at 751 ("every court has inherent authority to disbar or discipline attorneys for unprofessional conduct . . . .") (Beam, J. concurring in part). "Disciplinary procedures are viewed as a function of maintaining the integrity of the bar and avoiding the appearance of impropriety . . . . Thus, discipline of . . . attorneys is seen as both 'a catharsis for the profession and a prophylactic for the public.'" *In re Stoner,* 507 F.Supp. 490, 492 (N.D.Ga.1981) (citations omitted).

"Lawyers holding public office assume legal responsibilities going beyond those of other citizens . . . . [A]buse of public office can suggest an inability to fulfill the professional role of lawyers." MODEL RULES OF PROF'L CONDUCT, R. 8.4, cmt. 4 (2003). Courts, therefore, may require attorneys to speak with greater care and civility than is the norm in political campaigns. *Palmisano,* 70 F.3d at 487; *cf. Gentile v. Nev. Bar,* 501 U.S. 1030, 1065–76, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), *Fla. Bar v. Went for It, Inc.,* 515 U.S. 618, 634–35, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (discussing restrictions on attorney advertising).

An attorney is not absolutely liable for every statement that turns out to be incorrect. "It would unduly quell investigation and exposure of corruption to disbar an attorney who publicizes suspicious conduct, just because the suspicions were dispelled." *Palmisano,* 70 F.3d at 487. Furthermore, it is beyond peradventure that a legislator may, and very well should, advocate for the best interests of the public he represents. Respondent Acevedo–Vilá's allegations as to the sales of the DTCs had the salutary effect of spurring the Comptroller's investigation into the government's sales of the DTCs, an investigation which revealed irregularities in the sales process.

However, the Panel found that Respondent Acevedo–Vilá lacked support for both

his FEC complaint and his public statements premised on Sánchez–Delgado's sworn statements. This behavior, we find, is hard to characterize as unintentional. Respondent's contention that his behavior here was merely legislative, an extension of his long-standing concern over the DTC sales process, does not justify any falsehoods nor explain his single-mindedness in pursuing Petitioner Romero–Barceló. The evidence presented here leads us to wonder: Would Respondent have pursued this inquiry with the same zeal during his campaign had another individual been accused of DTC sale and campaign improprieties? Respondent held numerous press conferences detailing his every step with regards to the FEC complaint, while neglecting to offer material facts and exculpatory information to both the public and the FEC. The Panel found it curious that Respondent failed to submit Sánchez–Delgado's recantation, as do we. His particular silence as to the developments in the case speaks volumes. And while Respondent did eventually inform the FEC, he has yet to explain the time lapse.

Furthermore, we are concerned by Respondent Acevedo–Vilá's seeming lack of remorse over the incident. We do not suggest that he should have accepted the Panel's report without objection. Respondent had concerns and objections over the procedure of this court which we have carefully considered in this Opinion and Order. However, Respondent has approached this case with fervent zeal while not recognizing that this disciplinary proceeding presents more nuanced inquiries. His failure to acknowledge any possible wrongdoing on his part, or to offer any mitigating defenses for his behavior, is troublesome.

There is a growing lack of public confidence in both the political and legal systems. Ironic, then, that this case involves both. Respondent Acevedo–Vilá may have had true suspicions about the DTC sale process—we have no reason to suspect otherwise. However, that concern, when enveloped in a political campaign, led Respondent Acevedo–Vilá to engage in behavior that, unfortunately, overshadowed any legitimate inquiries into the DTC sale process. "The unpopularity of our profession, the accusations against it, must not and cannot be permitted to hide its finer service from our eyes. We, and no others, carry the burden of making the law worth having—over the long run, and from day to day." Karl L. Llewellyn, THE BRAMBLE BUSH 181 (Oceana Publications 1960) (1930). The circumstances in this case implicate that burden. The mere fact that some may consider the behavior here as par for the course in both the legal and political process when it is in actuality unethical suggests that we have been too lax in enforcing the clearly articulated duties of the bar. We skirted the outer boundary of appropriate conduct as an attorney in violation of Model Rule of Professional Conduct 8.4. We, therefore, recommend a public reprimand.

**IT IS SO ORDERED.**